2010 WY 36

**ULTRA RESOURCES, INC. a Wyoming corporation and Williams Production Rocky Mountain Co., a Delaware corporation, Appellants (Defendants),**

v.

**Doyle and Margaret M. HARTMAN, John H. Hendrix Corporation, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, Appellees (Plaintiffs).**

**Arrowhead Resources (U.S.A.) Ltd., Appellant (Defendant),**

v.

**Doyle and Margaret M. Hartman, John H. Hendrix Corporation, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, Appellees (Plaintiffs).**

**Lance Oil & Gas Company, a Delaware corporation, Appellant (Defendant),**

v.

**Doyle and Margaret M. Hartman, John H. Hendrix Corporation Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, Appellees (Plaintiffs).**

**Shell Rocky Mountain Production, LLC, a Delaware corporation and SWEPI, LP, a Delaware limited partnership, Appellants (Defendants),**

v.

**Doyle and Margaret M. Hartman, John H. Hendrix Corporation, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, Appellees (Plaintiffs).**

**Doyle and Margaret M. Hartman, John H. Hendrix Corporation, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, Appellants (Plaintiffs),**

v.

**Ultra Resources, Inc., a Wyoming corporation, Shell Rocky Mountain Production, LLC, a Delaware corporation, Lance Oil & Gas Company, a Delaware corporation, SWEPI, LP, a Delaware limited**

partnership, Williams Production Rocky Mountain Co., a Delaware corporation, and Arrowhead Resources (U.S.A.) Ltd., Appellees (Defendants).

Ultra Resources, Inc., a Wyoming corporation, Appellant (Defendant),

v.

Doyle and Margaret M. Hartman, John H. Hendrix Corporation, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, Appellees (Plaintiffs).

Shell Rocky Mountain Production, LLC, a Delaware corporation, Appellant (Defendant),

v.

Doyle and Margaret M. Hartman, John H. Hendrix Corporation, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, Appellees (Plaintiffs).

Nos. S–08–0258, S–08–0259, S–08–0260, S–08–0261, S–08–0262, S–08–0263, S–08–0264.

Supreme Court of Wyoming.

March 23, 2010.

Representing Ultra Resources, Inc. and Williams Production Rocky Mountain Co.: Douglas J. Mason of Mason & Mason, P.C., Pinedale, Wyoming; George W. Mueller of Burns, Wall, Smith and Mueller, P.C., Denver, Colorado. Argument by Mr. Mueller.

Representing Doyle and Margaret M. Hartman, John H. Hendrix Corporation, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook: Michael J. Sullivan and John A. Masterson of Rothgerber, Johnson & Lyons, LLP, Casper, Wyoming; James M. Lyons and D. Elizabeth Wills of Rothgerber, Johnson & Lyons, LLP, Denver, Colorado; J.E. Gallegos and Michael J. Condon of Gallegos Law Firm, P.C., Santa Fe, New Mexico. Argument by Messrs. Sullivan and Gallegos.

Representing Arrowhead Resources (U.S.A.) Ltd.: Nancy D. Freudenthal of Davis & Cannon, LLP, Cheyenne, Wyoming; Rebecca Hitchcock Noecker of Beatty & Wozniak, P.C., Denver, Colorado. Argument by Ms. Freudenthal.

Representing Lance Oil & Gas Company, Inc.: Paul J. Hickey of Hickey & Evans, LLP, Cheyenne, Wyoming; David W. Stark and Ezekiel J. Williams of Faegre & Benson, LLP, Denver, Colorado. Argument by Mr. Hickey.

Representing Shell Rocky Mountain Production, LLC and SWEPI, LP: David B. Hooper of Hooper Law Offices, P.C., Riverton, Wyoming; Phillip D. Barber of Phillip D. Barber, P.C., Denver, Colorado. Argument by Mr. Barber.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] This case encompasses seven appeals and cross-appeals and involves seven plaintiffs and six defendants.[1] The contest is over a net profits interest (NPI) granted by Malco Refineries, Inc., El Paso Natural Gas Company, and Continental Oil Company (referred to in the documents as "First Parties") to Novi Oil Company (Novi) in the 1950s. The NPI was consideration for Novi's assignment of certain oil and gas leases to First Parties. Generally, the district court concluded that the NPI continues to exist and is owned by the plaintiffs, who are successors to Novi, and the defendants, as successors to First Parties, are obligated to pay net profits to them. The district court also awarded statutory penalties, interest and attorney fees to the plaintiffs.[2] We affirm in part and reverse and remand in part.

## ISSUES

[¶ 2] The numerous briefs filed herein set forth dozens of issues, many of which are duplicative. We have identified the following separate issues:

### Summary Judgment Issues

1. Were the plaintiffs entitled to summary judgment on the question of whether the NPI survived termination of the Pinedale Unit?

2. Were the plaintiffs entitled to summary judgment on the question of whether they own the NPI and do the defendants have standing to contest plaintiffs' claim of ownership?

### Rule 52(c) Rulings

3. Did the district court err by granting the defendants' Rule 52(c) motion regarding the plaintiffs' duty to provide proof of their ownership of the NPI under Section 5 of the Pinedale Unit Area Net Profits Contract (Unit NPI Contract) or by determining that the plaintiffs gave sufficient notice of their ownership in Mr. Hartman's February 22, 2006, letter?

4. Did the district court err in granting the defendants' Rule 52(c) motion on the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing?

5. Did the district court err in granting the non-operator defendants' Rule 52(c) motion on the plaintiffs' Wyoming Royalty Payment Act, Wyo. Stat. Ann. §§ 30–5–301 through 305 (LexisNexis 2009) (WRPA) claims?

### Bench Trial Rulings

6. Did the district court correctly determine that the non-operating defendants breached the Unit NPI Contract by failing to pay the NPI?

7. Did the district court err by ruling that plaintiffs were entitled to be awarded WRPA interest and penalties against the operating defendants Shell and Ultra when the Unit NPI Contract provided that they could withhold payment of net profits, without interest, during the pendency of any dispute regarding ownership of the NPI?

8. Did the district court properly determine that State Lease 79–0645 was a "replacement lease" under the Unit NPI Contract?

9. Did the district court err by ruling that plaintiffs' claims were not time barred under either the statute of limitations or the equitable doctrine of laches?

10. Did the district court err by refusing to exclude certain expenses from the net profits calculation?

---

1. Two additional defendants, Questar Exploration and Production Company and Wexpro Company, reached a settlement with plaintiffs and were dismissed from this action.

2. Because there are several appeals and cross-appeals, it is not helpful to identify the parties as "appellants" and "appellees." Unless identified by name, the parties claiming ownership of the NPI will be identified as "plaintiffs" and the parties who are lessees and working interest owners will be identified as "defendants."

11. Did the district court err by holding all defendants jointly and severally liable for the entire judgment?

12. Did the district court properly grant credit to the defendants for plaintiffs' settlement with Questar/Wexpro?

***Attorney Fees***

13. Were the non-operators the prevailing parties and, therefore, entitled to an award of attorney fees under the WRPA?

14. Did the district court abuse its discretion by awarding plaintiffs over $3.9 million in attorney fees?

## FACTS

[¶ 3] In the 1950s, First Parties sought to develop oil and gas interests in Sublette County, Wyoming. Because Novi controlled some leases that First Parties wanted to include in their development plans, First Parties and Novi entered into the "Agreement for Assignment of Novi Leases and for a Net Profits Interest Pinedale Unit Area Sublette County, Wyoming" (Assignment Agreement). The Assignment Agreement provided that Novi would assign three federal leases and one fee lease to the First Parties in exchange for "5% of the net profits realized from operations for oil and gas by First Parties under the leases shown on Exhibit A...." Exhibit A included a list of sixty-two leases, including the four Novi leases. The First Parties intended to unitize the leases identified in Exhibit A, except portions of two of the Novi leases that were not to be included in the unit at that time. The Assignment Agreement further stated that Novi was also to receive an NPI for the portions of the leases not included in the unit and identified those leases in Exhibit A-1. The Assignment Agreement provided that final execution of the NPI documents and lease assignments were conditioned upon the federal government's approval of the Pinedale Unit.

[¶ 4] In addition, the First Parties entered into an agreement among themselves, the Supplemental Accounting Agreement. As found by the district court, the purpose of the Supplemental Accounting Agreement was to "outline[ ] the manner in which the First Parties would account for and pay any profits from production."

[¶ 5] In 1954, the Pinedale Unit was approved by the United States Geological Survey (USGS), and the Pinedale Unit Agreement (Unit Agreement) was executed between the operators, other working interest owners and Novi. Among other things, the Unit Agreement outlined the operators' responsibilities, included general unit accounting terms, and provided for contraction of the unit to eliminate non-producing properties at certain intervals.

[¶ 6] Consistent with the requirements of the Assignment Agreement, Novi and the First Parties entered into the Unit NPI Contract which pertained to the leases included in the Pinedale Unit and identified in Exhibit A. The Unit NPI Contract contains many of the terms and obligations that are presently at issue:

1. NET PROFITS INTEREST—

Subject to the conditions hereinafter set forth, First Parties agree to pay to Novi a sum or sums representing 5% of the net profits (as hereinafter defined), herein referred to as "said net profits interest," resulting from operations for oil and gas by First Parties, or any of them, under those certain leases committed to that certain Unit Agreement for the Development and Operation of the Pinedale Unit Area and shown on Exhibit A attached hereto and made a part hereof, such leases being herein referred to as "said leases."

2. COMPUTATION—

Net profits shall be computed on the basis of all operations under the Pinedale Unit applicable to said leases....

Net profits as used herein shall mean the gross revenue (not required for payment of the overriding royalties shown on Exhibit A and landowners' royalties) from unit operations allocable to said leases after deduction of all expenses of unit operations (unit operations being construed to include all operations of any of First Parties under said leases) except those charged to the working interest owners, if

any, under the said unit other than First Parties.

In computing gross revenue, there shall be taken into account the proceeds of production sold for delivery at the wellhead. As to production not so sold, the fair market value of such production at the wellhead shall be taken into account;

If there should be any overriding royalty or other burden on production allocated to the Novi leases other than the overriding royalties shown on Exhibit A and the landowners' royalties, such excess override or burden shall be exclusively the responsibility of Novi and Novi shall bear and pay any such additional burdens whether or not net profits are realized.

Expenses shall include by way of illustration but not by way of limitation, expenses incurred in connection with the preparation for the drilling of and drilling of wells, whether productive or dry; the equipping, completing, plugging and abandoning of wells; the producing of wells and treatment, storage and marketing of production therefrom; the building of roads, campsites and the making of improvements in connection with unit operations; expenses incurred in connection with exploratory work conducted in connection with operations hereunder; expenses incurred in connection with the examining and perfecting of and defense of titles to said leases, including attorneys' fees incurred in connection therewith; losses, damages or liabilities sustained or incurred in connection with unit operations; gross production and ad valorem taxes or any tax measured by production; premiums paid for workmen's compensation insurance, public liability, fire, wind, tornado or other insurance; and any other expenses and charges that are reasonable and customary in connection with the operation and development of oil and gas properties and which are properly chargeable against the leasehold interests. Without limiting the foregoing, the accounting with respect to unit operations shall be in accordance with the Accounting Procedure attached hereto and marked "Exhibit C–1" and made a part hereof to the extent that such exhibit is applicable and not inconsistent with the foregoing provisions and including the overhead charges provided for in said exhibit.

3. PAYMENT—

Inasmuch as the Operator in charge of operations under said leases and under the said Pinedale Unit Agreement will either be Continental or El Paso, or both, the responsibility for handling the accounting for net profits and making payments hereunder to Novi for its share thereof shall be the responsibility of Continental and El Paso, such parties (or either of them) being hereinafter sometimes referred to for convenience as "Operator."

Novi shall be entitled to receive its percentage of net profits at the end of any month whenever it shall appear at the end of such month that net profits have been realized as a result of operations under said leases, taking into consideration all expenses theretofore incurred in connection with such operations and all accounts payable or receivable with regard thereto at the end of said month and all payments of net profits theretofore made to Novi. In making the foregoing computations, deficits shall be carried over from month to month and the accumulated total thereto applied against subsequent earnings before profits will be considered to have accrued. Payment of such net profits shall be made as soon as practicable after the end of any month in which net profits have been so realized. Notwithstanding that there may be separate operations under said leases relating to separate deposits of oil and gas (whether conducted by Continental or El Paso or some by Continental and some by El Paso), all accounting for the purpose of determining net profits hereunder shall be upon a consolidated basis involving all operations under said leases and the said Pinedale Unit.

Operator shall keep an accurate record of all accounts hereunder, showing the costs and expenses incurred and charges made and all receipts and credits received, which record shall be available at all reasonable times for the examination and inspection of Novi or its duly authorized representative. Within one (1) month af-

ter the close of each calendar month, Operator shall furnish to Novi a statement of costs and expenses incurred and charges made and all receipts and credits received during such calendar month.

4. LOGS AND INFORMATION RELATING TO PRODUCTION AND EXPLORATORY WORK—

Operator shall furnish Novi copies of well logs of all types with respect to operations hereunder and shall, at Novi's request, furnish Novi with all information relative to producing operations hereunder or relative to exploratory work conducted in connection with operations hereunder whenever the expense of any such exploratory work is chargeable as an expense in computing net profits under the provisions hereof.

5. TRANSFER—

Operator shall not be required to take cognizance of any deed, assignment, transfer or passing of title by will, testament or inheritance of said net profits interest, or any interest therein, unless and until Operator shall have been furnished with legal evidence of such deed, assignment, transfer or passing of title by will, testament or inheritance which is acceptable to Operator. . . . In no event shall Operator be liable hereunder to any successor in interest of Novi or its successors for all or any part of said overriding royalty until after Operator has been furnished with proof of interest or notice of adverse claim of such successor in interest, and then only for payments accruing after the first day of the following calendar month. In the event of any dispute at any time concerning the ownership of any net profits interest payable hereunder, Operator may withhold payment of such net profits interest or any part thereof of the amount in dispute without interest until such dispute is settled.

. . . .

7. SURRENDER—

First Parties reserve and shall have the right to release and surrender said leases except those acquired from Novi, either in whole or in part, at any time without giving any notice thereof to or obtaining any

consent or approval thereof from Novi or Novi's successors in interest, and such release or surrender shall terminate the net profits interest herein provided for as to the leasehold interest which is so released and surrendered.

As to such of said leases as were acquired by First Parties from Novi, if First Parties desire at any time to surrender their entire and undivided interest in such leases, or any part, thereof, First Parties shall first offer in writing to transfer and assign the same to Novi . . . . and shall, upon acceptance of such offer by Novi . . . , transfer and assign such interest to Novi. Upon acceptance of such assignment, First Parties shall be relieved of any and all responsibility or liability hereunder with respect to the interest assigned. . . .

. . . .

Notwithstanding any surrender, release or assignment of interest under the provisions of this section, Novi's net profits interest in operations relating to lands the leasehold interest in which is not so surrendered, released or assigned shall remain a 5% net profits interest. In the event any lease is surrendered or released pursuant to the provisions of this section and Novi shall thereafter obtain a lease or other interest in the lands the leasehold interest in which is so released or surrendered, Novi shall be entitled to hold such interest free and clear of any obligations under the provisions hereof. In the event any lease is surrendered or released pursuant to the provisions of this section and thereafter First Parties, or any of them, obtain a lease covering lands the leasehold interest in which has been so surrendered, the interest so acquired or obtained by First Parties, or any of them, shall be subject to the provisions hereof, if such new lease is obtained within five (5) years from the date of any such surrender or release; otherwise, such new lease shall be held by First Parties, or any one of them acquiring such interest, free and clear of the provisions of this agreement and without any obligations whatsoever to Novi.

This agreement shall be binding upon and inure to the benefit of the heirs, repre-

sentatives, administrators, executors, successors and assigns of the parties hereto.

[¶ 7] Novi and First Parties also entered into the Net Profits Contract Pinedale Area of Interest Sublette County, Wyoming (Area NPI Contract) contemplated by the Assignment Agreement. The Area NPI Contract covered the portions of the two Novi leases lying outside the Pinedale Unit and identified in Exhibit A–1 of the Assignment Agreement. On March 18, 1955, Novi executed assignments of its leases to the First Parties.

[¶ 8] During the two decades following creation of the Pinedale Unit, the First Parties drilled some wells and discovered a large reservoir of gas in the Pinedale anticline, but, for various reasons, production was impracticable at that time. The record indicates that, over time, the USGS approved extensions to the automatic unit contraction date.[3] Finally, in 1977, the Pinedale Unit contracted from 91,000 acres to 14,000 acres, located within two participating areas.

[¶ 9] The Pinedale Unit terminated on July 10, 1981, without having earned any profits. Two new units were, however, created out of the Pinedale Unit acreage: the Mesa Unit in the north, and the New Fork Unit in the south. The federal documents approving formation of the Mesa and New Fork units established that the Pinedale Unit did not terminate until after the new units were in place and recognized that the acreage was transferred from the Pinedale Unit into the new units. The Mesa Unit Agreement stated that portions of the land within the unit were subject to the Pinedale Unit Agreement, and "in the event of a discovery of unitized substances in paying quantities under this agreement, the Pinedale Unit Agreement shall be contracted and the lands subject thereto shall be merged into this unit agreement...." The Department of Interior letter authorizing the New Fork Unit specifically stated that "the Fort Union participating area 'A' of the Pinedale Unit [was] ...

transferred intact to and committed to the New Fork unit." The New Fork Unit terminated in 2001.

[¶ 10] As of 2006, when plaintiffs demanded payment of the NPI and this action was filed, twenty-two of the original sixty-two leases covered by the Unit NPI Contract, including two of the leases assigned by Novi, all with issue dates of 1950 through 1952, were still in place. The continuation of the leases was the result of having been part of the Pinedale Unit, the automatic two year extension of the federal leases after contraction or termination of a unit, inclusion in the Mesa or New Fork units, and/or production on individual leases. The district court also determined that an additional lease, State Lease No. 79–0645, was a "replacement lease" subject to the NPI obligations under Section 7 of the Unit NPI Contract because it covered the same lands as two of the original Exhibit A leases and had been reacquired by a First Party within five years after the original leases were surrendered.

[¶ 11] Over time, all of the original parties to the agreements were replaced by successors. Plaintiffs Doyle and Margaret M. Hartman, Michael L. Klein and Jeanne Klein, Ronnie H. Westbrook and Karen Westbrook, and John H. Hendrix Corporation claim to have succeeded to Novi's NPI.[4] The leases remaining under the Unit NPI Contract became profitable in May 2005. On February 22, 2006, the plaintiffs sent a letter to the defendants, indicating that they owned the NPI and requesting an accounting and payment. When the defendants did not meet their demands, the plaintiffs brought suit on March 31, 2006. The plaintiffs' amended complaint lists the defendants in two groups: Group A defendants—Questar Exploration and Production Company (Questar), Wexpro Company (Wexpro), Ultra Resources, Inc. (Ultra), and Shell Rocky Mountain Production, L.L.C. (Shell)—working interest owners and operators in the Pinedale Field; and

---

3. A participating area was approved in 1957, causing the automatic contraction date to change to January 1, 1968. The contraction date was extended, by approval of the USGS, in 1967 and 1974.

4. Throughout this litigation, the plaintiffs' interest is treated for the most part as being equal to Novi's 5% interest, although the plaintiffs acknowledge that they own only a 4.98% NPI. A non-party owned the .02% balance, but it was purchased by Questar in 2007.

Group B defendants—Lance Oil & Gas Company (Lance), SWEPI, LP (SWEPI), Williams Production Rocky Mountain Co. (Williams), and Arrowhead Resources (U.S.A.) LTD (Arrowhead)—working interest owners in the Pinedale Field with no operating responsibilities.[5]

[¶ 12] The amended complaint asserted several claims for relief, including: declaratory judgment as to the validity, and plaintiffs' ownership, of the NPI under the Unit NPI Contract; breach of the Unit NPI Contract; breach of the duty of good faith and fair dealing; breach of the WRPA; slander of title (Questar); conversion; constructive trust (in the alternative); and rescission and reassignment of Novi leases to plaintiffs (in the alternative). The defendants generally denied the plaintiffs' claims and asserted various affirmative defenses and counterclaims.

[¶ 13] The plaintiffs filed two motions for summary judgment: Motion for Partial Summary Judgment No. 1 Declaring the Net Profits Interest as Lease–Based Pursuant to the Unambiguous Language of the Agreements; and Motion for Partial Summary Judgment No. 2 Declaring Plaintiffs the Owners of the Net Profits Interest. The defendants filed a motion for summary judgment arguing their obligation to pay net profits under the Unit NPI Contract depended upon the leases being included in the Pinedale Unit and, since the Pinedale Unit terminated without ever having shown any profits, the NPI no longer existed. Some of the defendants also moved for summary judgment asserting the plaintiffs' claims were barred by various statutes of limitation.

[¶ 14] The district court heard all of the summary judgment motions on April 30, 2007. It granted both of the plaintiffs' motions and denied all of the defendants' motions. The general effect of the district court's summary judgments rulings was twofold: the NPI survived termination of the Pinedale Unit, meaning that net profits continued to be due on production attributable to the leases, and the plaintiffs own the NPI. After the summary judgment rulings, the plaintiffs reached a settlement with defendants Questar and Wexpro. All claims between the plaintiffs, Questar and Wexpro were dismissed by an order entered on September 5, 2007. Thereafter, the parties agreed to waive a jury trial and have the remaining issues determined by the district court.

[¶ 15] The bench trial on the outstanding claims began on October 9, 2007, and ended on October 19, 2007. At the end of the plaintiffs' case-in-chief, the defendants moved for judgment as a matter of law under W.R.C.P. 52(c).[6] The district court granted the defendants judgment under Rule 52(c) as follows: 1) pursuant to Section 5 of the Unit NPI Contract, the defendants were not obligated to pay the NPI until March 2006, because they were not notified of the plaintiffs' ownership interest until February 22, 2006; 2) the defendants had not violated the implied covenant of good faith and fair dealing by failing to investigate the NPI ownership or by failing to account for and pay amounts owed thereunder; and Lance and Arrowhead, as non-operator working interest owners, were not liable for interest or penalties under the WRPA.

[¶ 16] During the trial, both sides presented expert accounting testimony calculat-

---

5. After trial, the defendants filed Defendants' Motion to Order Plaintiffs to Produce Newly Discovered Settlement Agreements and to Alter or Amend Judgment, in which it was alleged that two non-defendants, Wind River Resources, Inc. and Double Eagle Petroleum Company, owned working interests in the subject leases and had settled with the plaintiffs. This motion was denied, and the two companies have not become party defendants, but the role of their settlement in determining damages has been raised.

6. W.R.C.P. 52(c) provides as follows:
 (c) *Judgment on partial findings.*—If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. The party against whom entry of such a judgment is considered shall be entitled to no special inference as a consequence of such consideration, and the court may weigh the evidence and resolve conflicts. Such a judgment shall be supported by findings as provided in subdivision (a) of this rule.

ing the NPI on the burdened leases. Although the experts differed in their final net profit figures, they agreed that revenues and expenses on the NPI leases exceeded $2 billion. The plaintiffs' expert testified that the NPI due to the plaintiffs for the period of March 2006 through December 2006 was more than $4 million. The defense expert testified that there were no net profits on the NPI leases during that time.

[¶ 17] After the bench trial, the district court issued its Findings of Fact, Conclusions of Law and Judgment. The order reiterated its summary judgment and Rule 52 rulings and also included the following holdings:

1. All defendants, as successor to First Parties, breached their obligations under the Unit NPI Contract.

2. State Lease 79–0645 is a replacement lease under § 7 of the Unit NPI Contract and is, therefore, burdened by the NPI because it covers the same property as two Exhibit A State of Wyoming leases and was acquired by a First Party successor within five years after the state leases were surrendered by El Paso.

3. The principal sum due for net profits payable for the period March 2006 through December 2006 is $4,896,589.

4. The operator defendants violated the WRPA by not paying net profits beginning in March 2006, the month after the plaintiffs notified them of their ownership of the NPI. The operators are liable to the plaintiffs for the unpaid net profits, plus the statutory 18 percent per annum interest and the statutory penalty of $100 per month.

5. All of the defendants are jointly and severally liable under the Unit NPI Contract for the judgment amount.

6. Applying the accounting provisions from the Supplement Accounting Agreement, defendants are liable for 70% of the judgment amount, after allowing a credit of 30% for the amounts paid in settlement by Questar and Wexpro.

7. All defendants remain obligated under the Unit NPI Contract for accounting and payment of the NPI, beginning with January 2007 production.

8. The filing of this action in March 2006 was timely under the applicable ten-year statute of limitations for breach of contract. *See* Wyo. Stat. Ann. § 1–3–105(a)(i) (LexisNexis 2009). The defendants did not breach the contract until 2005, when net profits began to accrue and became payable. The plaintiffs' claim for breach of contract accrued, at the earliest, in May 2005, when revenue and expense data became available.

9. The doctrine of laches does not apply in an action at law for breach of contract. Further, the defendants proved neither inexcusable delay nor prejudice to establish any of defendants' equitable defenses.

10. The operator defendants were responsible for the plaintiffs' attorney fees and costs.

[¶ 18] The district court subsequently reviewed the plaintiffs' request for attorney fees and granted judgment in their favor for over $3.9 million. The defendants appealed the district court's summary judgment determinations, adverse trial rulings and attorney fees award, and the plaintiffs appealed the district court's rulings against them.

## DISCUSSION

[¶ 19] In order to facilitate analysis of the many issues in this case, we will divide the discussion into types of orders: 1) summary judgments; 2) rulings as a matter of law under Rule 52(c); 3) rulings after the bench trial; and 4) attorney fee rulings.

### I. Summary Judgments

#### A. *Standard of Review*

[¶ 20] As to the review of a summary judgment, we have stated:

A summary judgment is appropriate when no genuine issue as to any material fact exists and when the prevailing party is entitled to have a judgment as a matter of law. *Covington v. W.R. Grace–Conn., Inc.*, 952 P.2d 1105, 1106 (Wyo.1998); *see also* W.R.C.P. 56(c). We evaluate the propriety of a summary judgment by employing the same standards and by using the same materials as the lower court em-

ployed and used. *Kirkwood v. CUNA Mutual Insurance Society,* 937 P.2d 206, 208 (Wyo.1997). We do not accord deference to the district court's decisions on issues of law. *Kanzler v. Renner,* 937 P.2d 1337, 1341 (Wyo.1997). In cases requiring the interpretation of a contract, a summary judgment is appropriate only if the contract is clear and unambiguous. *Kirkwood,* 937 P.2d at 208; *Treemont, Inc. v. Hawley,* 886 P.2d 589, 592 (Wyo.1994).

*Wolter v. Equitable Res. Energy Co.,* 979 P.2d 948, 951 (Wyo.1999). "The court considers the record from the viewpoint most favorable to the party opposing the motion, giving all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record to the opposing party." *Powder River Oil Co. v. Powder River Petroleum Corp.,* 830 P.2d 403, 406–07 (Wyo.1992). *Comet Energy Services, LLC v. Powder River Oil & Gas Ventures, LLC,* 2008 WY 69, ¶ 5, 185 P.3d 1259, 1261 (Wyo.2008). This standard applies equally in actions for declaratory judgment. *Coffinberry v. Bd. of County Comm'rs of the County of Hot Springs,* 2008 WY 110, ¶ 3, 192 P.3d 978, 979 (Wyo. 2008); *Laughter v. Bd. of County Comm'rs for Sweetwater County,* 2005 WY 54, ¶ 9, 110 P.3d 875, 879 (Wyo.2005).

**B. Were the plaintiffs entitled to summary judgment on the question of whether the NPI created in the Unit NPI Contract survived termination of the Pinedale Unit?**

[¶ 21] The issue of whether the NPI created in the Unit NPI Contract was conditioned upon the continuation of the Pinedale Unit is pivotal. The defendants claim that the NPI terminated with the Pinedale Unit and the district court erred by interpreting the NPI as being a continued burden on the leases listed in the Unit NPI Contract. The plaintiffs contend that the district court properly concluded the NPI continued to encumber the leases after termination of the Pinedale Unit.

[¶ 22] Resolution of this issue requires interpretation of contracts. Our primary focus in contract interpretation is the parties' intent. *Carlson v. Flocchini Invs.,* 2005 WY 19, ¶ 15, 106 P.3d 847, 854 (Wyo. 2005). The "language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use." *Moncrief v. Louisiana Land Exploration Co.,* 861 P.2d 516, 524 (Wyo.1993). We employ common sense in interpreting contracts and ascribe the words with a rational and reasonable intent. *Comet,* ¶ 6, 185 P.3d at 1261; *Caballo Coal Co. v. Fidelity Expl. & Prod. Co.,* 2004 WY 6, ¶ 11, 84 P.3d 311, 314 (Wyo.2004); *Wadi Petroleum, Inc. v. Ultra Resources, Inc.,* 2003 WY 41, ¶¶ 10–11, 65 P.3d 703, 708 (Wyo.2003). Courts should consider the circumstances surrounding execution of the agreement to determine the parties' intention, even in reviewing unambiguous contracts. *Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 6, 126 P.3d 909, 915 (Wyo.2006); *Caballo,* ¶ 11, 84 P.3d at 314–15.

[¶ 23] If we determine that the contract conveys a "double or obscure meaning," we must conclude that it is ambiguous. *Wolter,* 979 P.2d at 951. The determination of whether a contract is ambiguous is a matter of law for the court to decide, regardless of whether or not the parties agree as to the contract's meaning. *Id.* Parol evidence of the parties' intent regarding what particular terms in their agreement mean is considered only when the contract is ambiguous. *Wells Fargo Bank Wyo., N.A. v. Hodder,* 2006 WY 128, ¶ 31, 144 P.3d 401, 412 (Wyo.2006). Because we use an objective approach to interpret contracts, evidence of a party's subjective intent is not admissible, regardless of whether the court determines a contract is ambiguous or clear. *Omohundro v. Sullivan,* 2009 WY 38, ¶ 24, 202 P.3d 1077, 1084–85 (Wyo.2009).

[¶ 24] The defendants do not argue that the relevant contractual language is ambiguous or that genuine issues of material fact exist which preclude summary judgment. They argue, instead, that the district court erred as a matter of law in interpreting the contract language.

[¶ 25] Although there is a dispute between the parties over which documents are

properly considered in determining the meaning of the NPI, everyone agrees that the document which actually created the NPI was the Unit NPI Contract. *Ferguson v. Coronado Oil Co.,* 884 P.2d 971, 976 (Wyo. 1994) established that the nature of a net profits interest is "determined from the instrument creating the interest." We will, therefore, start with the Unit NPI Contract; however, before we parse the language of the agreement, it is helpful to understand the concepts of leasing and unitization in oil and gas exploration and production.

[¶ 26] The majority of the mineral estate First Parties leased and committed to the Pinedale Unit was owned by the federal government. The primary term of most of the leases was five years. Prior to unitization, a lease could only be held after the primary term if there was hydrocarbon production on the leasehold. Formation of an oil and gas unit is a means of holding a number of leases without drilling and obtaining production on each lease.

[¶ 27] The Pinedale Unit was a federal oil and gas exploration unit, governed by the Department of the Interior. After unitization, the unit operator has a certain period of time to explore for oil and gas, and, if production is obtained, a "participating area" is designated and each lease is considered held by production. Land located within the unit but outside a participating area does not participate in the production in the participating area, and, in accordance with the unit agreement, the boundaries of the unit typically contract to include only the acreage of participating areas, thus eliminating from the unit non-producing acreage. This has the effect of consolidating the producing, or participating areas, and releasing the leases that · are not producing. In order to encourage development of the leases that are eliminated from a unit by contraction, federal leases are automatically extended by two years after such elimination. *See* 30 U.S.C. § 226(m) (1952). The state leases included in the Pinedale Unit apparently did not include a provision for an automatic two year extension after unit contraction.

[¶ 28] Although the date for automatic contraction of the Pinedale Unit was extended at least twice, the unit finally contracted in 1977 reducing it from over 90,000 acres to just over 14,000 acres. The contraction triggered the automatic two year extension for the eliminated federal leases. When the Pinedale Unit was terminated in 1981, some of the lands that were included in the Pinedale Unit folded into the newly created New Fork and Mesa Units. The New Fork Unit terminated in 2001, but the Mesa Unit is still in operation. All in all, twenty-two of the original sixty-two leases included in the Unit NPI are still held by production, including two of the original Novi leases.

[¶ 29] Keeping in mind the purposes of oil and gas leasing and unitization, we turn to the Unit NPI Contract. First, we note there is no express language in the contract which states that the NPI would terminate if the leases were no longer included in the Pinedale Unit. Nevertheless, the defendants argue the Unit NPI Contract language indicates Novi and First Parties intended that the NPI would terminate with the Pinedale Unit.

[¶ 30] There are several provisions that are relevant to the determination of whether the parties intended that the NPI was dependent on the continued existence of the Pinedale Unit. In Section 1, the "Net Profits Interest" provision, First Parties agreed to pay to Novi 5% of the net profits

> resulting from operations for oil and gas by First Parties, or any of them, under those certain leases committed to that certain Unit Agreement for the Development and Operation of the Pinedale Unit Area and shown on Exhibit A attached hereto and made a part hereof, such leases being herein referred to as "said leases."

[¶ 31] The separate lease descriptions, referencing the sixty-two leases [7] in the Pinedale Unit which were subject to the Unit NPI Contract, were attached as Exhibit A to the Unit NPI Contract. The defendants emphasize that the Unit NPI Contract defines "said leases" as leases that are "committed" to the Pinedale Unit Agreement "and" shown

---

7. There were other leases in the Pinedale Unit that were not subject to the NPI.

on Exhibit A. They claim, therefore, that the contract created two conditions that must be met before the NPI was valid: the leases be committed to the Pinedale Unit *and* shown on Exhibit A.

[¶ 32] The defendants argue that Novi and First Parties intended that the term "committed" to the Pinedale Unit be interpreted in accordance with its particular usage in the oil and gas trade. They claim that, because the Pinedale Unit Agreement is specifically referenced in the Unit NPI Contract, it must be considered in interpreting the Unit NPI Contract. Thus, according to the defendants, because the Pinedale Unit terminated years ago before any profits were realized, the leases were no longer "committed" to the unit and the NPI no longer exists.

[¶ 33] We agree that Novi's and First Parties' use of the term "committed" to the unit has special meaning in the context of unitization in general and the Pinedale Unit specifically, and the Unit Agreement is appropriate evidence in interpreting the Unit NPI Contract. Formation of the Pinedale Unit was an important part of the parties' plan in negotiating for assignment of the Novi leases and the resulting NPI. Unitization was a means for both Novi and the First Parties to obtain more time for development of the leases, and the Unit NPI Contract would not have been executed had the unit not been approved. Obviously, the parties intended that the leases covered by the Unit NPI Agreement initially be "committed" to the Pinedale Unit under the terms of the Pinedale Unit Agreement approved by the federal government. That does not, however, answer the question of whether the parties intended that the leases be burdened by the NPI only so long as the unit existed.

[¶ 34] The Unit NPI Contract does not provide that the NPI was tied only to unit production or that the continued existence of the Pinedale Unit was required for the NPI to remain an obligation on the leases. We do not read the clear language of the net profit provision as creating two separate conditions for payment—the leases had to continue to be committed to the Pinedale Unit and also shown on Exhibit A. Instead, we agree with the district court and conclude that the phrase simply identifies the leases originally included in the Unit NPI Contract. Two of the leases assigned by Novi actually contained both lands to be included in the Pinedale Unit and lands outside of the unit and those leases were included on both Exhibit "A" and Exhibit "A–1." Nothing in the Unit NPI Contract indicates the parties intended that, if the unit terminated, the NPI would cease to burden the portions of those leases originally within the unit, but continue to burden the portions outside of the unit.

[¶ 35] Considering the entire transaction, which involved Novi's assignment of leases both in and out of the Pinedale Unit, it makes sense that the parties would refer to the leases committed to the unit in the Unit NPI Contract. It does not, however, mean that the continuance of the unit was required in order for the NPI to remain a burden on the leases.

[¶ 36] Other provisions of the Unit NPI Contract confirm this reading of the Net Profits provision. Initially, we note that throughout the Unit NPI Contract, the parties' obligations and benefits are in reference to the leases rather than to the unit. In the "Computation" provision of the Unit NPI Contract, net profits were to be computed on the basis of all unit operations *applicable to* and *allocable to* the leases, not to all of the operations under the Pinedale Unit. The defendants assert that, since unit operations were referenced in computing the NPI, the parties must have intended that the NPI would terminate if the Pinedale Unit no longer existed. It is true that the Unit NPI Contract contemplated that unit operations pertaining to the leases would have to be considered in order to establish expenses and revenues and calculate the NPI. However, the fact that the unit no longer exists does not prevent computation of the NPI. The consolidated net profits applicable and allocable to the NPI leases can still be calculated whether or not any of the properties are unitized.

[¶ 37] The Unit NPI Contract limits the definition of "unit operations" for the purposes of the NPI as "all operations of any of First Parties under said leases." This is significant because the unit could, and did,

contain leases other than those subject to the NPI. The Unit NPI Contract defined deductible expenses as those "which are properly chargeable against the leasehold interests." This provision acknowledged that the unit existed and would incur expenses and revenues but specifically required that the NPI be calculated using only the revenues and expenses pertaining to the leases covered under the Unit NPI Contract. If First Parties and Novi had intended that the NPI be conditioned on the leases' continued inclusion in the Pinedale Unit, the NPI would have been calculated under the provisions of the Pinedale Unit Agreement, using the entire unit, rather than the Unit NPI Contract which pertained to some, but not all, of the leases included in the unit.

[¶ 38] Moreover, under the "Logs and Information Relating to Production and Exploratory Work" provision of the Unit NPI Contract, Novi was entitled to information, not on the entire unit, but "whenever the expense of any such exploratory work is chargeable as an expense in computing net profits...." In other words, Novi had the right to access information pertaining to the leases listed in Exhibit A to the Unit NPI Contract, but not to all leases within the unit. That provision reinforces the parties' intent that the NPI obligation is not dependent on the leases' continued inclusion in the Pinedale Unit.

[¶ 39] The only provision of the Unit NPI Contract that speaks to termination of the NPI is the "Surrender" section. It is very significant that the surrender provision does not provide for termination of the NPI upon removal of the leases from the Pinedale Unit. Although the First Parties were allowed to surrender leases which could then result in termination of the NPI, the contract specifically protected Novi's interest in several ways.

> As to ... said leases as were acquired by First Parties from Novi, if First Parties desire at any time to surrender their ... interest in such leases, ... First Parties shall first offer ... to transfer and assign the same to Novi. Upon acceptance of such assignment, First Parties shall be relieved of any and all responsibility or liability

hereunder with respect to the interest assigned....

The provision continues:

> Notwithstanding any surrender, release or assignment of interest under the provisions of this section, Novi's net profits interest in operations relating to lands the leasehold interest in which is not so surrendered, released or assigned shall remain a 5% net profits interest.

By providing that in the event of surrender of any of the Exhibit A leases, the NPI would continue on "operations relating to lands in which the leasehold interest is not so surrendered," this provision clearly attaches the NPI to the leases rather than to continuation in the unit.

[¶ 40] Another part of the Surrender provision provides:

> In the event any lease is surrendered or released pursuant to the provisions of this section and thereafter First Parties, or any of them, obtain a lease covering lands the leasehold interest in which has been so surrendered, the interest so acquired or obtained by First Parties, or any of them, shall be subject to the provisions hereof, if such new lease is obtained within five (5) years from the date of any such surrender or release....

This is commonly known as an "anti-wash" provision. Such provisions prevent a lessee from "washing" an encumbrance from a lease by acquiring it subject to an encumbrance tied to the lease, dropping the lease and then re-leasing the same property without the encumbrance. The Surrender provision of the Unit NPI Contract indicates a clear intent that Novi's interest be protected in the face of the First Parties' right to unilaterally surrender leases which would, in effect, occur if the unit was contracted and/or terminated. The application of the surrender and anti-wash provisions is discussed in more detail in Section III.D., below. That discussion about the replacement lease demonstrates very clearly that continuation of any particular lease in the unit was a voluntary and unilateral decision belonging to the First Parties and from which Novi intended its interest to be protected.

[¶ 41] These provisions reflect the reality that production units and their boundaries are temporary, whereas lease assignments are forever, and the operator, not the holder of an NPI, has control over the duration and configuration of the unit. Under the terms of the Pinedale Unit Agreement, the working interest owners could terminate the unit if 75% of them (on an acreage basis) agreed to do so; Novi had no say in that decision. If the net profits interest were contingent upon the continued existence of the Pinedale Unit, the First Parties could have terminated the unit at any time simply to "wash" the net profit interest. That clearly would have been contrary to the intent of the Unit NPI Contract and Novi's purpose in entering into the assignment/net profit transaction. The surrender provision would have been written much differently if the parties intended the NPI to terminate if the leases were no longer part of the Pinedale Unit.

[¶ 42] Considering that unitization, contraction, lease extension and reunitization are well known and valuable tools in retaining leaseholds and encouraging production, it is unreasonable to conclude that Novi would have intended that it could lose its valuable lease rights and the NPI simply because the First Parties decided to contract or terminate the Pinedale Unit. Given that the Unit NPI Contract said nothing about termination of the Pinedale Unit leading to termination of the NPI, ascribing such intent to Novi would violate our rule against reading language into a contract and would be counter to assigning a rational and reasonable intent to contractual language. *Wadi Petroleum,* ¶¶ 10–11, 65 P.3d at 708. The logical view of the Unit NPI Contract is that Novi permanently gave up its leases in exchange for a permanent 5% NPI, not a temporary one. Thus, we agree with the district court's conclusion that the clear intention of the parties to the Unit NPI Contract was to encumber the leases identified in Exhibit A, regardless of whether the Pinedale Unit continued.

[¶ 43] The parties disagree over what extrinsic evidence of the circumstances surrounding the Unit NPI Contract should be considered in interpreting it. This Court has, for many years, stated that courts should consider the circumstances surrounding execution of an agreement, i.e., facts showing the parties' relationship, the subject matter of the contract, and the parties' apparent purpose in making the contract, to determine the parties' intention, even when reviewing unambiguous contracts. *Mullinnix,* ¶ 6, 126 P.3d at 915; *Moncrief,* 861 P.2d at 524; *Balch v. Arnold,* 9 Wyo. 17, 29, 59 P. 434, 436 (1899). In *Boley v. Greenough,* 2001 WY 47, ¶¶ 14–22, 22 P.3d 854, 858–60 (Wyo. 2001), we recognized the importance of interpreting contracts at the time and place of execution because the term "overriding royalty" used in a conveyance thirty years before had a different meaning than it did at the time of interpretation. Parol evidence, which is distinguishable from extrinsic evidence, of the parties' intent is not, however, admissible if the contract is unambiguous.[8] *Wells Fargo,* ¶ 31, 144 P.3d at 412.

[¶ 44] Although the defendants dispute the appropriateness of considering some of the other agreements, they do argue the Area NPI Contract is a relevant fact or circumstance in this dispute without explanation of how that is consistent with their position that only the language of the Unit NPI Contract (and the associated unit agreement) can be considered to determine the parties' intent. Novi and First Parties entered into the Area NPI Contract, which had the same date as the Unit NPI Contract, to cover the portions of the Novi leases that were not to be included in the Pinedale Unit Agreement. That agreement clearly ties the NPI to the leases and makes no reference to the Pinedale Unit. The defendants argue that, considering the Area NPI Contract, the parties obviously knew how to draft a lease based

---

**8.** In their summary judgment filings, the defendants presented some deposition testimony from persons involved in the negotiation and drafting of the documents for Novi and First Parties in the 1950s. The parts of the testimony emphasized by the defendants pertained to the parties' subjective intent with regard to whether the leases had to be committed to the Pinedale Unit in order to be burdened by the NPI. Such evidence is inadmissible whether the contract is ambiguous or not, as the subjective intent of the parties is irrelevant in our objective approach to contract interpretation. *Omohundro,* ¶ 24, 202 P.3d at 1084–85.

NPI agreement and, because the Unit NPI Contract refers to the unit in terms of calculating the NPI and identification of the leases covered under the agreement, they must have intended that the unit NPI remain only as long as the Pinedale Unit continued to exist.

[¶ 45] We agree with the district court and conclude just the opposite—the Area NPI Contract provides support for the district court's interpretation of the Unit NPI Contract. The Area NPI Contract is nearly identical to the Unit NPI Contract, except there are no references to the unit and no allocation of unit revenues and expenses to particular leases in the former. That difference recognizes the reality that calculation of the NPI while the Exhibit A leases were part of the Pinedale Unit required consideration of unit operations. It would, however, be illogical to conclude that Novi and the First Parties intended that the NPI would attach permanently to the portion of the leases outside the unit but attach to the portions of the leases in the unit only so long as the First Parties unilaterally decided not to contract or terminate the unit and the defendants provide no explanation why the parties would have intended such a result. We conclude, therefore, the Area NPI Contract was properly considered as a relevant circumstance surrounding execution of the Unit NPI Contract and supports the district court's interpretation of such.

[¶ 46] The defendants then argue that the district court erroneously considered the Assignment Agreement and Supplemental Accounting Agreement in interpreting the Unit NPI Contract. They claim that, since the Unit NPI Contract was unambiguous and did not expressly incorporate the Assignment Agreement or Supplemental Accounting Agreement, the district court should not have considered the other documents and they were, in fact, inadmissible parol evidence. The defendants also suggest, although with little relevant discussion, that the Assignment Agreement should not be considered because its terms provided that it would no longer be effective after the leases had been assigned and the net profits contracts had been executed.

[¶ 47] We do not need to resolve the issue of whether the Assignment Agreement and Supplemental Accounting Agreement were properly considered by the district court because they simply provide further support for the plain language of the Unit NPI Contract. The Assignment Agreement provided a roadmap of the ensuing transactions, which culminated in the Unit NPI Contract, Area NPI Contract and lease assignments. It is significant that the agreement did not differentiate between the NPI that would be created in the Unit NPI Contract and the NPI that would be created in the Area NPI Contract. The Supplemental Accounting Agreement provides for accounting between First Parties on a lease by lease basis.

[¶ 48] With or without consideration of the two disputed agreements, we would arrive at the same result as the district court did-the Unit NPI Contract was clear and unambiguous and the NPI continued to encumber the relevant leases after contraction and/or termination of the Pinedale Unit.[9] The district court properly granted summary judgment in the plaintiffs' favor on this issue.

*C. Were the plaintiffs entitled to summary judgment on the question of whether they own the NPI?*

[¶ 49] In their amended complaint the plaintiffs requested a declaration that they "are the owners of the NPI as alleged and are entitled to payment of the NPI and an accounting thereof by the Group A defendants from operations" under the leases. It

9. The defendants also claim that the district court improperly considered certain title opinions in concluding that the NPI continued to exist after termination of the Pinedale Unit. Although the district court mentioned the title opinions, it expressly ruled that they were in the "nature of expert testimony; that is, useful to the Court if necessary to understand the facts or evidence or legal conclusions to be drawn—but] not necessary or helpful [here] as that is precisely the function of the Court." The district court remarked that the only relevance of the title opinions was to establish that the defendants were aware "since, at a minimum 1981" of the Unit NPI Contract. The district court did not improperly consider the title opinions as part of its contract interpretation analysis.

is fair to say that initially the defendants' resistance to paying the plaintiffs was based largely on their argument that the NPI had terminated with the Pinedale Unit. Nevertheless, the plaintiffs sought a declaration in their second motion for summary judgment that they were the owners of the NPI. Their motion and the accompanying memorandum contained an extensive review of the series of mesne conveyances through which they claimed ownership of the NPI. In response, the defendants conducted their own review of the title of the NPI. None of the defendants, however, claimed they owned the NPI.

[¶ 50] The district court reviewed the conveyances and concluded, as a matter of law, plaintiffs owned the NPI. The defendants appealed that determination and the plaintiffs argue, on appeal, that the defendants do not have standing to challenge the district court's conclusion that they own the NPI.

> "Standing" is short for "standing to sue," which requires a "legally protectable and tangible interest at stake in the litigation." *Olsten Staffing Servs., Inc. v. D.A. Stinger Servs., Inc.*, 921 P.2d 596, 599 (Wyo.1996) (quoting *Black's Law Dictionary* 1405 (6th ed.1990)). The phrase "tangible interest" has been equated with the phrase "personal stake in the outcome." *Goshen Irrigation Dist. v. Wyo. State. Bd. Of Control*, 926 P.2d 943, 947 (Wyo.1996); *State ex rel. Bayou Liquors, Inc. v. City of Casper*, 906 P.2d 1046, 1048 (Wyo.1995). The person alleging standing must show a "perceptible," rather than a "speculative" harm from the action; a remote possibility of injury is not sufficient to confer standing. *Sinclair Oil Corp. v. Wyo. PSC*, 2003 WY 22, ¶ 13, 63 P.3d 887, 894–95 (Wyo.2003).

*Halliburton Energy Serv., Inc. v. Gunter*, 2007 WY 151, ¶ 11, 167 P.3d 645, 649 (Wyo. 2007). Standing is a jurisdictional issue, involving a question of law that may be raised at any time, and is reviewed *de novo*. *Hicks v. Dowd*, 2007 WY 74, ¶ 18, 157 P.3d 914, 918 (Wyo.2007). The standing issue was raised in the plaintiffs' consolidated brief in cases S–08–0258 through 0261. Without citation to

any authority, the plaintiffs make the following argument:

> Defendants have no standing to contest ownership. They concede on appeal that they have now been furnished with legal evidence of plaintiffs' ownership. No other party claims any ownership of the NPI. The district court's Judgment settled any "ownership dispute" and provides defendants with protection from multiple claims for payment. Yet, defendants contest plaintiffs' NPI ownership. They do so in order to extinguish the NPI, not because they are accounting to or paying net profits to some other party or expect to do so.

It seems odd that the plaintiffs would contest the standing of the defendants to appeal a trial court ruling on a claim that was raised by the plaintiffs against the defendants. However, the plaintiffs' argument does alert us to a related issue.

[¶ 51] In any declaratory judgment action, the plaintiff must allege a justiciable controversy which requires, among other things, a showing that the parties before the court have a genuine interest in the dispute and the proceedings are truly adverse in nature. *See, Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo.1974) and its progeny. The necessity of showing an actual controversy is recognized in the elements of claims for declaration of ownership of property, whether real or personal. In a claim for declaration of ownership of personal property, i.e., conversion, the plaintiff must allege that the defendant is exercising dominion over the plaintiff's property. *Ferguson*, 884 P.2d at 975. In a claim for declaration of ownership of real property, i.e., quiet title, the plaintiff must allege an interest in the real property and the defendant "claims an estate or interest adverse to him." Wyo. Stat. Ann. § 1–32–201 (LexisNexis 2009). *See also, Bamforth v. Ihmsen*, 28 Wyo. 282, 296, 204 P. 345, 352 (1922) (stating plaintiff has "the right to bring an action to quiet title against a party making an adverse claim thereto").

[¶ 52] A Washington court of appeals recognized that one cannot bring an action for declaration of title to property against someone who does not claim a right to the property. *Ruvalcaba v. Kwang Ho Baek*, 140

Wash.App. 1021, 2007 WL 2411691, No. S8877–0–I at 1 (Aug. 27, 2007). The court stated that a complaint brought by the plaintiff "against strangers to the severed property" failed to state a claim upon which relief could be granted. The same concept is stated in other contexts. For example, a Hawaiian court held that a defendant cannot set up title in a stranger to the litigation to defeat a plaintiff's quiet title claim. *See, e.g., Hana Ranch, Inc. v. Kanakaole*, 1 Haw.App. 573, 623 P.2d 885, 888 (1981). Similarly, Missouri courts have repeatedly stated that:

The trial court in a quiet title action must "ascertain and determine the rights of the parties under the pleadings and evidence, grant such relief as may be proper and determine the 'better' title, as between the parties to the proceeding, though a title superior to the rights of either party may be held by a stranger."

*Manard v. Williams*, 952 S.W.2d 387, 389–90 (Mo.Ct.App.1997), quoting *Robertson v. North Inter–River Drainage Dist.*, 842 S.W.2d 544, 546 (Mo.App.1992). *See also, Pitts v. Pitts*, 388 S.W.2d 337, 339 (Mo.1965).

[¶ 53] Any declaration by the court in this case as to the superiority of plaintiffs' title to defendants' title would have no effect since the defendants did not claim title to the NPI and others who may assert an interest in the NPI would not be bound by the declaration because they were not represented in the case. Stated yet another way, "a mere stranger to the title cannot complain about a cloud upon the title." *McVey v. Unknown Shareholders of Inland Coal and Washing Co.*, 100 Ill.App.3d 584, 56 Ill.Dec. 135, 427 N.E.2d 215, 218 (1981). Thus, a defendant can only assert his own title; if he does not make a claim to title, there is no dispute to adjudicate. Although not directly on point, we think that the concepts announced by this Court in *Mountain West Farm Bureau Mut. Ins. Co. v. Hallmark Ins. Co.*, 561 P.2d 706, 710 (Wyo.1977) are applicable here. "It is well settled that in no case can a stranger to a contract maintain an action upon it." Nowhere in the record do the defendants claim that they had somehow acquired ownership of the NPI, and no other party claimed ownership adverse to the plaintiffs.

[¶ 54] Given that we have affirmed the district court's ruling that the NPI continued after termination of the Pinedale Unit, someone owns the interest. The district court stated in its order on the plaintiffs' second motion for summary judgment:

It is significant that no other person or entity [besides the plaintiffs] has stepped forward to claim the net profits interest or any portion thereof. The Defendants do not and cannot claim ownership of the net profits interest and maintain that it ceased to exist with the termination of the Pinedale Unit.

The true issue involving the plaintiffs' title was whether they gave sufficient notice of their ownership of the NPI to the defendants, as required by the Unit NPI Contract, to entitle them to payment. Once the plaintiffs satisfied that requirement, the defendants had no further right to challenge ownership of the NPI.

[¶ 55] The plaintiffs provided evidence of the mesne conveyances that transferred title of the NPI from Novi and, ultimately, to them. After execution of the NPI contracts, Novi merged into Woodson Oil Company (Woodson). Woodson then defaulted on a debt to Prudential Insurance Company (Prudential) and, to cancel the indebtedness, conveyed a large package of properties in several states, including the NPI, to Prudential. Prudential conveyed the "Woodson properties" to Texas Pacific Coal & Oil Company (TP Coal), reserving among other things, 50% of the net profits realized from operations on the Woodson properties (referred to as the "Net Profit Overriding Royalty"). Prudential ultimately conveyed its Net Profit Overriding Royalty to Plaintiffs in 1984. Plaintiffs claimed that they acquired a 50% interest in the NPI through the Prudential conveyance.

[¶ 56] The plaintiffs maintained that they acquired the rest of the NPI through the TP Coal chain of title. After acquiring the "Woodson properties" from Prudential, TP Coal transferred all of its rights in any county or state referenced in an attached exhibit, including Sublette County, Wyoming, to Jo-

seph E. Seagram & Sons, Inc. (Seagram) in 1963. The conveyance included specific reference to a net profits interest in four Sublette County leases. In 1970, Seagram executed a document transferring its Sublette County interests, including the four Sublette County leases, to Texas Pacific Oil Company (TP Oil). A subsequent conveyance from Seagram to TP Oil in 1980, clarified that Seagram intended to transfer all of its "right, title, interest and estate of every nature and description ... which were acquired from [TP Coal] ... covering lands located within the United States" to TP Oil. TP Oil thereafter transferred all of its interests in the United States to Sun Oil Company (Sun). TP Oil also executed a supplemental conveyance to Sun, specifically identifying the aforementioned four Sublette County leases. In 1986, Sun transferred to plaintiffs the NPI obtained from TP Oil.

[¶ 57] The defendants' objections to the plaintiffs' chain of title pertain to whether the title or contractual rights to the NPI were effectively passed in various conveyances. First, they argue that the plaintiffs did not acquire any part of the NPI through Prudential because Prudential "sold all of its interest in the NPI" to TP Coal. This argument is a red herring. Even if we assume that the defendants' position is true, it does nothing to further their case because if Prudential did not reserve any of the NPI, then it all passed to TP Coal and would have been conveyed through that succession to plaintiffs. As such, the defendants' argument as to the validity of the Prudential conveyance does not in any way affect their obligation to pay the NPI to the plaintiffs.

[¶ 58] The defendants also challenge three of the mesne conveyances in the TP Coal/Sun chain, specifically the TP Coal to Seagram transfer, the Seagram to TP Oil transfer, and the TP Oil to Sun transfer.

The defendants claim that, at most, those conveyances transferred an interest in the four listed Sublette County leases. The defendants' arguments are not convincing because the following immutable facts establish plaintiffs' right to payment of the NPI: 1) the NPI continues to exist, so, obviously, someone owns it; 2) the defendants do not own it; 3) if the conveyances were not sufficient to pass ownership of the NPI to the plaintiffs, then it would remain with the grantors; 4) the conveyances questioned by the defendants purported to transfer *all* of the grantors' interests even though they also listed specific interests and did not contain any express reservation of ownership of the NPI interest by any of plaintiffs' grantor(s); and 5) although they question the efficacy of certain conveyances, defendants do not point to any particular predecessor in plaintiffs' chain of title as having a current, valid claim of ownership.[10] Moreover, it is significant, given the amount of money and time involved in these proceedings, that no predecessor in the plaintiffs' chain of title has come forward to claim that it owns part or all of the NPI. Thus, there are no adverse claims to plaintiffs' right to the NPI and the defendants run no risk of being subject to multiple claims to the interest.[11] To the extent that the district court's summary judgment stated that the plaintiffs had provided a sufficient showing of their right to payment under the NPI, we affirm it. However, to the extent that it was intended to quiet title to the plaintiffs against any claims by others who are not parties to this action, we conclude that there was no justiciable controversy and reverse.

## II. Rulings as a Matter of Law Under Rule 52(c)

### A. *Standard of review*

[¶ 59] Wyoming Rule of Civil Procedure 52(c) allows the district court to

---

10. The plaintiffs claim that the defendants concerns are only valid if the NPI is an interest in real property and it is, in fact, a contractual interest. The defendants protest that the plaintiffs argued the NPI was a real property interest in the district court and cannot, now, maintain that it is only a contractual right. Given our conclusion that the plaintiffs have provided evidence that the NPI vested in them and there is no evidence that any of the plaintiffs' predecessors reserved or currently claim any right to the

NPI, we do not need to determine whether the interest is contractual or realty.

11. If defendants were truly concerned about multiple claims, they could have filed an interpleader action and/or initiated a proper declaratory judgment action naming all possible other claimants, which would have resulted in eliminating, as a matter of law, any possibility of multiple claims.

enter judgment during a bench trial if, after the plaintiffs have presented all of their evidence, the court determines the claim cannot be maintained under the controlling principles of law. A Rule 52(c) motion is similar to a motion for judgment as a matter of law in a jury trial under W.R.C.P. 50(a)(1). We review an order granting judgment as a matter of law under Rule 50(a)(1) *de novo,* giving no deference to the district court's decision. *Conner v. Bd. of Co. Comm'rs, Natrona Co.,* 2002 WY 148, ¶ 8, 54 P.3d 1274, 1279 (Wyo. 2002). A district court's Rule 52(c) order granting judgment on partial findings is evaluated using the same standard. *Hutchinson v. Taft,* 2010 WY 5, ¶ 12, 222 P.3d 1250, 1253 (Wyo.2010).

[¶ 60] We regard the plaintiffs' evidence as true and afford it all favorable and reasonable inferences. *Mountain View/Evergreen Improv. and Serv. Dist. v. Casper Concrete Co.,* 912 P.2d 529, 531 (Wyo. 1996). When the plaintiffs' proof has failed in some aspect, the motion is properly granted; however, when the plaintiffs have presented a prima facie case, the motion is properly denied. *Hutchinson,* ¶ 12, 222 P.3d at 1253.

**B. Did the district court err by granting the defendants' Rule 52(c) motion regarding the plaintiffs' duty to provide proof of their ownership of the NPI under Section 5 of the Unit NPI Contract or by determining that the plaintiffs gave sufficient notice of their ownership in Mr. Hartman's February 22, 2006, letter?**

[¶ 61] The district court determined that the relevant leases began generating net profits in May 2005. It ruled, however, that Section 5 of the Unit NPI Contract required the plaintiffs to give notice of their ownership before defendants were obligated to pay the net profits. The court also concluded, as a matter of law, that the plaintiffs gave the required notice in Mr. Hartman's February 22, 2006, letter, triggering the defendants' obligation to pay beginning in March 2006. On appeal, the plaintiffs claim, under the Unit NPI Contract and the WRPA, they are entitled to payment of net profits for the entire time the leases were profitable. Defendants, on the other hand, maintain that the plaintiffs did not give sufficient notice of their ownership until they provided the actual conveyance documents in July 2006, and therefore were not entitled to payment of the NPI until August 2006.

[¶ 62] The relevant provision of the Unit NPI Contract states:

5. TRANSFER—

Operator shall not be required to take cognizance of any deed, assignment, transfer or passing of title by will, testament or inheritance of said net profits interest, or any interest therein, unless and until Operator shall have been furnished with legal evidence of such deed, assignment, transfer or passing of title by will, testament or inheritance which is acceptable to Operator.... In no event shall Operator be liable hereunder to any successor in interest of Novi or its successors for all or any part of said overriding royalty until after Operator has been furnished with proof of interest or notice of adverse claim of such successor in interest, and then only for payments accruing after the first day of the following calendar month. In the event of any dispute at any time concerning the ownership of any net profits interest payable hereunder, Operator may withhold payment of such net profits interest or any part thereof of the amount in dispute without interest until such dispute is settled.

[¶ 63] The district court orally ruled on the defendants' Rule 52(c) motions during trial and also included written rulings on the motions in its bench trial order. With regard to the notice issue, the district court stated:

### FINDINGS OF FACT

36. Section 5 affords protection to the First Parties in two distinct circumstances. The first is a lack of notice to the operator of a transfer of all or any portion of the NPI to a third party. In this circumstance, the First Parties are protected from multiple claims and unknown claims by the language of Section 5 that provides

the operator is not liable for any payment until furnished proof of ownership and only then for payments accruing after the first day of the following calendar month.

37. The second circumstance involves competing claims for the same interest or portion thereof, i.e. an ownership dispute. In that circumstance, Section 5 provides that the operator may withhold payment of the NPI in dispute, without interest, until the dispute is settled.

38. There is no language in Section 5 that authorizes the First Parties to avoid their respective obligations to account and pay in this case.

39. It is true that the defendants vigorously contest the plaintiffs' chain of title and ownership of the NPI. The Court has previously decided that issue in plaintiffs' favor.

40. However, the defendants' primary contention is that the NPI terminated along with the Pinedale Unit, simply no longer existed, and therefore, the obligation to account and pay no longer exists. In essence, the defendants seek refuge in a provision of a contract they claim no longer has force.

41. On February 22, 2006, Doyle Hartman sent a letter requesting an accounting and payment of the NPI. Exhibit E19. The addressees included Ultra, [Shell], SWEPI, [Arrowhead], Lance and Williams. The letter was accompanied by eleven extensive attachments, including a chronological chain of title. The chain of title reflected twenty-two detailed entries by instrument date, description and recordation establishing the plaintiffs as the successor owners of the NPI. Defendants were thereby furnished with the plaintiffs' proof of interest in satisfaction of Section 5 of the Net Profits Contract. The letter of February 22, 2006 was adequate notice under Section 5 of the Net Profits Contract of the plaintiffs' ownership interest.

42. 4.98% of the net profits for the period March—December 2006, on consolidated accounting including State Lease 79–0645, SCPPA and Haliburton is $4,896,589.

*CONCLUSIONS OF LAW*

87. Section 5 of the Net Profits Contract precludes plaintiffs from recovering net profits realized before March 2006 (the February 22, 2006 Hartman letter marking the date the operators were first furnished with proof of the interest). However, defendants also cite to the portion of § 30–5–301(a) of the WRPA reading "unless other periods or arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds."

88. The plaintiffs contend that this result would thwart the public policy and remedial nature of the WRPA by allowing the defendants to retain net profits accumulated prior to March 2006, profits the plaintiffs contend the defendants are not entitled to or do not own. The language of Section 5 of the Net Profits Contract compels a different result. The plaintiffs were simply not entitled to receive net profits until they had complied with the notice provisions of Section 5.

89. However, the "unless other periods or arrangements . . ." language in § 30–5–301(a) refers to the timing of payment, not the amount of payment. By the language of Section 5 of the Net Profits Contract, the defendants were not obligated to pay net profits until March 2006. Under the contract and the WRPA, the defendants had a duty to account for and pay net profits as soon as practicable commencing March 2006 and, if there were a reason payment could not be made, deposit the funds in an escrow account.

[¶ 64] Starting with Section 5 of the Unit NPI Contract, plaintiffs claim that the purpose of that provision was to allow the First Parties to withhold payment of the NPI in the face of competing claims to protect them from being forced to make duplicate payments. They insist that, since there were no competing claims to the NPI, the defendants were obligated to pay the NPI for the entire time the leases were profitable.

[¶ 65] It is true that much of Section 5 is concerned with competing claims for ownership of the NPI; however, the provision also expressly states: "In no event shall Operator

be liable hereunder to any successor in interest of Novi or its successors for all or any part of said overriding royalty until after Operator has been furnished with proof of interest or notice of adverse claim ... and then only for payments accruing after the first day of the following calendar month." This language could not be any clearer. The plain language of this provision does not limit its application to instances of competing claims. The use of the alternates "proof of notice or adverse claims" confirms that there are two different scenarios where the non-liability provision applies—when the new owner has not provided proof of his interest and when there is no notice of an adverse claim. Novi and First Parties could have limited application of the provision to cases of competing claims but they did not. The parties to the Unit NPI Contract used the mandatory language "in no event" to elucidate the compulsory notice requirement. If we were to interpret Section 5 as advocated by the plaintiffs, we would have to disregard that clear, mandatory language.

[¶ 66] In addition, the provision stating that the operator would only be responsible for payments accruing after the first day of the month following sufficient notice indicates that the payment obligation is not triggered until such notice is given. Obviously, there will always be someone with title to the interest, and, once title has passed, the predecessor no longer has a right to receive the NPI payment. The parties to the Unit NPI Contract could have stated that the First Parties' obligation to pay the successor would accrue upon passing of the title, thereby insuring there would be no gaps in the payment obligation. They did not adopt such an obligation but, instead, stated that no payment was due until the month after sufficient notice was given. This provision refutes the plaintiffs' claim that the parties did not intend that the operator be able to avoid payment in the event of insufficient or delayed notice.

[¶ 67] We discern a valid purpose in requiring the owner of the NPI to come forward prior to triggering the payment obligation. This case dramatically demonstrates how complex issues of title and accounting can be in the context of mineral interests. A great deal of unnecessary effort and costs to the operator could be avoided by simply requiring the NPI owner to give notice of his interest prior to generating the payment obligation. We agree with the defendants and the district court that the clear language of the Unit NPI Contract protected the operators from liability prior to receiving notice of the plaintiffs' interests.

[¶ 68] Plaintiffs also argue that the WRPA prohibited the defendants from disregarding their obligation to pay the NPI. Before we analyze the precise issue presented, we will provide a brief overview of our statutory interpretation rules and the WRPA.

[¶ 69] This Court interprets statutes to effectuate the legislature's intent. When the wording is clear and unambiguous, we give effect to the plain language of the statute. The rules of statutory construction apply only if the statutory language is ambiguous or subject to varying interpretations. Statutory interpretation is a question of law, reviewed *de novo*. *Cook v. Swires*, 2009 WY 21, ¶ 17, 202 P.3d 397, 402 (Wyo.2009); *Chevron U.S.A., Inc. v. Dep't of Revenue*, 2007 WY 43, ¶¶ 9–10, 13, 154 P.3d 331, 334–35 (Wyo.2007).

[¶ 70] The WRPA is intended to " 'stop oil [and gas] producers from retaining other people's money for their own use.' " *Cities Service Oil & Gas Corp. v. State*, 838 P.2d 146, 156 (Wyo.1992), quoting *Independent Producers Marketing Corp. v. Cobb*, 721 P.2d 1106, 1110 (Wyo.1986). *See also, Cabot Oil & Gas Corp. v. Followill*, 2004 WY 80, ¶ 10, 93 P.3d 238, 242 (Wyo.2004). As such, the WRPA is intended to be remedial and is liberally construed. *Ferguson*, 884 P.2d at 979.

[¶ 71] The act takes effect when the lessee discovers a royalty payment deficiency. *Cities Service*, 838 P.2d at 157. It provides deadlines for payments of royalties to persons "legally entitled" to such payments, although the parties may by contract provide for other "arrangements for first and subsequent payments." The act also requires the appropriate parties to provide royalty information to the royalty or other interest own-

ers in accordance with the statutes. Section 30–5–301(a); Section 30–5–305(b). Under the WRPA, a party obligated to make a payment is liable for 18% interest on payments not made in accordance with the act. Section 30–5–303(a). There is, however, a good faith exception included in § 30–5–302 which allows a party legally obligated to pay a royalty to escrow the funds until a determination is made as to who is legally entitled to payment. Section 30–5–303(b) and (c) also provide that the prevailing party in any proceedings brought under the act is entitled to attorney fees and costs and provides a penalty of $100 per month for failing to provide complete reporting to the interest owner.

■ [¶ 72] We recognized that the WRPA applies to net profit interests in *Ferguson*, 884 P.2d at 979. The plaintiffs claim, therefore, that the WRPA obligated the defendants to pay them all net profits, even those that accrued before they provided notice of their interest. They rely on the following provisions:

The proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto, except as hereinafter provided, commencing not later than six (6) months after the first day of the month following the date of first sale and thereafter not later than sixty (60) days after the end of the calendar month within which subsequent production is sold, unless other periods or arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds. Payment shall be made directly to the person or persons entitled thereto by the lessee or operator or by any party who assumes such payment obligation under any legal arrangement.

Section 30–5–301(a).

Any delay in determining any person legally entitled to an interest in the proceeds from production shall not affect payments to all other persons entitled to payment. In instances where payment cannot be made for any reason within the time limits specified in W.S. 30–5–301(a), the

lessee or operator, purchaser or other party legally responsible for payment shall deposit all proceeds credited to the eventual interest owner to an escrow account ... Payment of principal and accrued interest from such accounts shall be paid by the escrow agent to all persons legally entitled thereto within thirty (30) days from the date of receipt by the escrow agent of final legal determination of entitlement thereto.

Section 30–5–302.

[¶ 73] The WRPA does not provide a remedy to plaintiffs in this instance because the person seeking protection of the act must be "legally entitled" to the payment. Here, the plaintiffs were not "legally entitled" to payment of the NPI until they provided the notice required by Section 5 of the Unit NPI Contract. The Court cannot change the parties' agreement by "liberally" construing the WRPA. The district court properly concluded, as a matter of law, that under the Unit NPI Contract the plaintiffs were obligated to provide sufficient notice of their ownership to the operator before they were entitled to payment of the NPI and the WRPA did not change that responsibility.

■ [¶ 74] We turn, now, to the question of the sufficiency of plaintiffs' notice. Under Section 5 of the Unit NPI Contract, the plaintiffs were entitled to payments accruing after the first day of the calendar month following notice to the defendants. In particular, Section 5 states that "Operator shall not be required to take cognizance of any deed, assignment, transfer ... of said net profit interest ... unless and until Operator shall have been furnished with *legal evidence* of such deed, assignment, transfer or passing of title by will, testament or inheritance which is acceptable to Operator," and "[i]n no event shall Operator be liable hereunder to any successor in interest of Novi or its successors for all or any part of said overriding royalty until after Operator has been furnished with *proof of interest.*" (Emphasis added).

[¶ 75] Plaintiff Doyle Hartman sent a letter dated February 22, 2006, to the defendants. The letter, admitted into evidence at the trial, outlined the requirements of the

Unit NPI Contract and summarized the conveyances that resulted in plaintiffs' ownership of the NPI. Mr. Hartman attached eighty-four pages of documentation to his letter, including a chronological chain of title which referenced all of the conveyance documents; BLM documents; and a title opinion recognizing the title transfer. The district court determined that the plaintiffs' February 22, 2006, letter provided sufficient notice of their ownership of the NPI, thereby entitling them to payment commencing March 1, 2006.

[¶ 76] The defendants maintain on appeal that the district court's determination that Mr. Hartman's letter was sufficient notice of the plaintiffs' interest was erroneous because the letter did not contain copies of the actual transfer documents. They claim that the "legal evidence" required by the Unit NPI Contract was not presented by the plaintiffs until July 2006 when they provided the actual conveyances showing their chain of title.

[¶ 77] The defendants direct us to some cases they argue support their assertion that the "legal evidence" of title could only be established by providing the actual conveyance documents to the operators. *Olsen v. Olsen (In re Estate of Olsen)*, 254 Neb. 809, 579 N.W.2d 529, 531–32 (1998), involved questions of title to interests in real property, and the court ruled that the conveyance instrument is the best evidence of title. We certainly have no quarrel with that statement of law in the context of litigation. However, Section 5 does not state that the evidence provided by the successor must be the best evidence or otherwise admissible in court. The defendants also cite to *Lapeze v. Amoco Prod. Co.*, 842 F.2d 132 (5th Cir.1988), in support of their argument that Mr. Hartman's letter was insufficient notice of the plaintiffs' ownership of the NPI. In that case, the court simply held that the notification provisions of the parties' contract, which required a certified copy of the recorded instrument, had to be met before the lessee was required to make payments to a succes-

sor lessor. We agree with the general principle that the contract controls the notification requirement.

[¶ 78] Section 5 states that the successor must furnish "legal evidence" of the change of ownership acceptable to the operator and "proof of interest." While the section lists types of evidence of transfer (like deeds and assignments), it does not specifically state that the actual conveyance documents must be provided to the operator. Mr. Hartman's February 22, 2006, letter identified the relevant transactions and provided grantors/grantees, dates of conveyances and recording information. That information unquestionably placed the operators on notice as to the plaintiffs' asserted chain of title.

[¶ 79] Section 5 also states that the evidence must be acceptable to the operator. Mr. Hartman testified that the operators did not respond to his letter by requesting additional information about the plaintiffs' title,[12] and the defendants do not direct us to any evidence indicating that the operators asked for additional information pursuant to Section 5's "operator's approval" provision after receiving Mr. Hartman's letter. The defendants' failure to request additional documentation serves to distinguish this situation from *Lee v. Gulf Oil Expl. and Prod. Co.*, 318 N.W.2d 766 (N.D.1982), another case cited by defendants. In *Lee*, the North Dakota Supreme Court concluded that Gulf was not required to take cognizance of the transfer of an interest because the transferee had not provided recorded deeds after Gulf requested them.

[¶ 80] Under the circumstances presented here, the district court properly concluded, as a matter of law under Rule 52(c), Mr. Hartman's letter provided sufficient notice of the plaintiffs' ownership of the NPI. Given there is no indication that the operators asked for additional documentation to satisfy the Unit NPI Contract Section 5 require-

---

12. The defendants' failure to ask for additional information stands in stark contrast to Questar/Wexpro's approach to the problem. Questar/Wexpro contacted Mr. Hartman in 2004 seeking information about the NPI, and on February

11, 2005, sent a letter setting forth specific questions about the plaintiffs' title. Mr. Hartman responded to their requests for additional information in a March 17, 2006, letter.

ment, the plaintiffs were not obligated to provide the actual conveyance documents.

[¶ 81] In a related matter, defendants argue that the district court's finding of fact number 32 contravened its Rule 52 order dismissing the plaintiffs' claims for the period prior to March 1, 2006. Finding of Fact No. 32 stated:

> 32. The 5% net profits as calculated under the leases subject to the NPI for the period May 2005—December 2006, on consolidated accounting including SCPPA and Haliburton is $21,030,564.

The defendants claim that they tailored their evidence to the post February 2006 period after the district court announced its Rule 52(c) order and, therefore, were not given a sufficient opportunity to litigate the NPI amounts for the time prior to that period.

[¶ 82] Considering our ruling that the district court properly determined that the NPI payment obligation did not accrue until March 1, 2006, we fail to see how the defendants were prejudiced by the district court's finding as to the amount generated by the NPI from May 2005, when profits first accrued, through December 2006, the last date for which accounting evidence was available or offered. The district court did not state that the defendants were responsible for paying the pre-March 2006 net profits. It simply made a ruling as to the amount accrued under the NPI for the entire period of profitability to provide context for the rest of its findings, including its determination of the amount due on the NPI from March 2006, through December 2006. Even if we assume the defendants were not given a sufficient opportunity to present net profits evidence pertaining to the period prior to March 1, 2006, we hold that any error was harmless. W.R.A.P. 9.04 directs us to disregard "[a]ny error, defect, irregularity or variance which does not affect substantial rights."

## C. Did the district court err in granting the defendants' Rule 52(c) motion on the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing?

[¶ 83] The plaintiffs asserted a claim for breach of the covenant of good faith and fair dealing implied in the Unit NPI Contract. After the plaintiffs rested, the defendants moved for judgment as a matter of law under Rule 52(c) on that claim. The district court granted the defendants' motion, ruling that the defendants' legal position regarding the Unit NPI Contract was not arbitrary or unreasonable and the plaintiffs did not present a prima facie case that the defendants acted in bad faith. On appeal, the plaintiffs argue the district court's ruling was erroneous.

[¶ 84] This Court recognized that parties to a commercial contract may assert a claim for breach of the covenant of good faith and fair dealing based upon a contract theory[13] in *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 2001 WY 23, ¶ 24, 18 P.3d 645, 655 (Wyo.2001). Restatement (Second) of Contracts § 205 (1981) states the general principle: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." We have determined that "the implied covenant requires that neither party to a commercial contract act in a manner that would injure the rights of the other party to receive the benefit of the agreement." *City of Gillette v. Hladky Constr., Inc.*, 2008 WY 134, ¶ 30, 196 P.3d 184, 196 (Wyo.2008). A party breaches the covenant by interfering or failing to cooperate in the other party's performance under the contract. *Scherer*, ¶ 19, 18 P.3d at 653.

[¶ 85] As we explained in *Whitlock Constr., Inc. v. South Big Horn County Water Supply Joint Powers Bd.*, 2002 WY 36, ¶ 24, 41 P.3d 1261, 1267 (Wyo.2002), quot-

---

13. Although the defendants suggest that the plaintiffs also asserted a claim for breach of the implied covenant based in tort, the plaintiffs' argument on appeal focuses on their contractual claim. Thus, we will not discuss the requirements to establish a tort claim for violation of the covenant. *See, e.g., Cathcart v. State Farm Mut.*

*Auto. Ins. Co.*, 2005 WY 154, ¶ 24, 123 P.3d 579, 589 (Wyo.2005) (discussing the differences between the tort and contract claims for breach of the implied covenant of good faith and fair dealing, especially the requirement for showing the existence of a special relationship between the parties in order to recover in tort).

ing *Scherer*, ¶ 29, 18 P.3d at 653–54 (internal quotes and citations omitted), the implied covenant of good faith and fair dealing

> requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party.... The purpose, intentions and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties. The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties. In the absence of evidence of self-dealing or breach of community standards of decency, fairness and reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant.

Although we recognized that resolution of a bad faith claim will generally involve a factual inquiry, a party is entitled to a judgment as a matter of law "if, under the facts in the record, the party's actions alleged as a basis for the breach of the implied covenant were in conformity with the clear language of the contract." *Scherer*, ¶ 19 n. 2, 18 P.3d at 654 n. 2.

[¶ 86] The plaintiffs' argument generally focuses upon the defendants' actions before Mr. Hartman's February 22, 2006, letter advising them of the plaintiffs' interest. They state that the defendants violated their obligations under the Unit NPI Contract to account, pay or escrow funds for net profits and to acknowledge or investigate the ownership of the NPI. Our affirmance of the district court's ruling regarding the plaintiffs' obligation to give defendants notice of their interest before their right to net profits payment accrued resolves much of the bad faith claim. As we stated in Section II.B., the plaintiffs had an affirmative duty to come forward with proof of their ownership of the interest. The contract did not impose upon the defendants an affirmative duty to search for the NPI owner.

[¶ 87] The facts of *Whitlock* and our resolution of the implied covenant claim in that case are instructive here. The South Big Horn County Water Supply Joint Powers Board (JPB) solicited bids for installation of underground utilities for a municipal water supply, and Whitlock submitted a bid. *Whitlock*, ¶¶ 3–6, 41 P.3d at 1263–64. Although Whitlock was not the low bidder, the JPB voted to award the project to Whitlock because it had concerns about the purported low bidder. *Id.*, ¶¶ 6–7, 41 P.3d at 1264. The project manual provided to all bidders stated that the construction contract would not be effective unless the agencies providing funding for the project concurred in the award of the contract. *Id.*, ¶ 4, 41 P.3d at 1264. The funding agencies did not agree with awarding the project to Whitlock instead of to the low bidder. *Id.*, ¶ 10, 41 P.3d at 1265. After the JPB rescinded its award of the contract to Whitlock, Whitlock brought suit. *Id.*, ¶¶ 10–11, 41 P.3d at 1265.

[¶ 88] Whitlock claimed that the JPB breached the implied covenant of good faith and fair dealing by failing to use good faith efforts to obtain the concurrence of the funding agencies. *Id.*, ¶ 23, 41 P.3d at 1267. We agreed with the district court's conclusion that there was no breach of the covenant. We noted that the contract specifically provided that it was contingent upon agency concurrence and did not impose an affirmative duty on the JPB to obtain such concurrence. *Id.*, ¶ 25, 41 P.3d at 1267. Rejecting Whitlock's claim that an implied duty to seek concurrence was included in the contract, this Court stated,

> [h]ad the parties intended to impose such a duty upon the JPB, they were required to expressly state that intention in the contract itself. We are not willing to infer that such a duty existed absent clear language in the contract indicating that was the parties' intent.

*Id.*, ¶ 25, 41 P.3d at 1267–68.

[¶ 89] Applying the *Whitlock* principles here, we refuse to imply an affirmative obligation upon the defendants to identify and locate the plaintiffs as net profit interest

owners when that responsibility was not set forth in the Unit NPI Contract. Moreover, such an obligation would conflict with the NPI owners' responsibility in Section 5 to provide notice of their interest before the defendants were obligated to pay.

[¶ 90] With regard to the plaintiffs' claim that the defendants breached the implied covenant of good faith and fair dealing after they informed defendants of their interest, we note that the plaintiffs stated at the pretrial conference that their claim focused on the defendants' pre-litigation conduct. Consistently, we refused in *Roussalis v. Wyoming Med. Center, Inc.*, 4 P.3d 209, 256–57 (Wyo.2000), to rule that litigation conduct could be considered in a bad faith claim. Consequently, only the short period between Mr. Hartman's letter (February 22, 2006) and the filing of this lawsuit by the plaintiffs (March 31, 2006) may be considered in addressing the bad faith claim. While the defendants were technically in violation of the contract when they failed to pay the net profits beginning in March 2006, the plaintiffs do not point to any specific evidence to establish that the defendants breached any standard of decency or fairness.[14] We agree with the district court's substantive assessment that, although the defendants' position that the NPI had expired with the Pinedale Unit was ultimately unsuccessful, the plaintiffs did not establish that the defendants acted in bad faith when they made that argument. The district court did not err by granting judgment as a matter of law on the plaintiffs' bad faith claim.

### D. Did the district court err in granting the non-operator defendants' Rule 52(c) motion on the plaintiffs' Wyoming Royalty Payment Act claims?

[¶ 91] After the plaintiffs rested, non-operating defendants Lance and Arrow-

head[15] moved for a judgment as a matter of law on the plaintiffs' claims under the WRPA. The district court granted the motion, concluding that the non-operators under the Unit NPI Contract were not governed by the act.

[¶ 92] As we explained in Section II.B., the WRPA is a remedial act which makes obligors liable for interest and penalties for failing to pay and report to interest owners in accordance with its deadlines. Section 30–5–303 states:

(a) Any lessee or operator, purchaser or other party legally responsible for payment who violates the provisions of this article is liable to the person or persons legally entitled to proceeds from production for the unpaid amount of such proceeds, plus interest at the rate of eighteen percent (18%) per annum on the unpaid principal balance from the due date specified in W.S. 30–5–301(a).

(b) The district court for the county in which a well producing oil, gas or related hydrocarbons is located has jurisdiction over all proceedings brought pursuant to this article and the prevailing party in any proceedings brought pursuant to this article shall be entitled to recover all court costs and reasonable attorney's fees.

(c) Any person who fails to provide royalty information as provided in W.S. 30–5–305(b) is liable to the affected royalty, overriding royalty or other nonworking interest owner in the amount of one hundred dollars ($100.00) per month that complete reporting is not provided to the interest owner.

[¶ 93] The plaintiffs maintain that the district court erred in interpreting § 30–5–303(a) as not applying to the non-operating

---

14. As we explained in footnote 12, the plaintiffs took over a year to put together their response to Questar/Wexpro's title questions. It is not, therefore, surprising that the defendants did not immediately respond to Mr. Hartman's letter.

15. SWEPI and Williams are also non-operator defendants. At the trial, they took no position on this issue because the attorneys representing them also represented operating defendants. In-

stead, the attorneys stated that their clients would "simply abide" by the court's decision, although they also noted that their non-operator clients would stand in the same position as Arrowhead and Lance. The district court later confirmed that its ruling applied to all of the non-operating defendants. On appeal, SWEPI and Williams adopted Arrowhead's and Lance's responses.

defendants. They claim that the non-operating defendants were lessees and working interest owners and, therefore, liable under the clear language of the act. The term "lessee" is defined at § 30–5–304(a)(i) as: "the person entitled under an oil and gas lease to drill and operate wells, paying the lessor a royalty and retaining the remainder, known as the working interest." "Working interest" is defined as: "the interest granted under an oil and gas lease, giving the lessee the right to work on the leased property to search for, develop and produce oil and gas and the obligation to pay all costs of production." Section 30–5–304(a)(viii). It is undisputed that Lance and Arrowhead were lessees and working interest owners. However, that does not answer the question of whether they fall within the auspices of the WRPA.

[¶ 94] We interpreted § 30–5–303 in *Moncrief v. Harvey*, 816 P.2d 97, 107–09 (Wyo.1991). In that case, Texaco had an oil and gas lease on land owned by the State of Wyoming. After unitizing the lease with others, Texaco entered into a farmout agreement for Moncrief to conduct operations on the lease. Harvey owned an overriding royalty on the lease and, when he did not receive the royalty payments he believed he was entitled to, he brought suit against Moncrief and Texaco. We ruled that, although Texaco was obligated to pay a proportionate share of Harvey's royalty interest, it was not a "lessee or operator, purchaser or other party legally responsible for payment" within the meaning of the WRPA.

[¶ 95] In reaching that decision, we looked to Moncrief's and Texaco's relative responsibilities under the farmout agreement, to conclude:

> Texaco was not legally responsible for the actual remittance of its share of royalties to Harvey. We will not hold that the non-executive owner of a working interest is responsible for remittance out of its share of the proceeds for purposes of calculating penalty interest. Since Texaco was not legally responsible for interest under the Royalty Payment Act, it follows, under the rationale in *State v. BHP Petroleum*, 804 P.2d 671 (Wyo.1991), that it was not liable for the seven percent interest

ordered by the trial court either. We therefore reverse the trial court's order assessing interest against Texaco.

*Id.* at 109. The *Moncrief* decision makes it clear that the WRPA applies only to parties contractually obligated to actually remit payments to royalty interest owners. In that respect, the term "legally responsible for payment" modifies "any lessee or operator, purchaser or other party." This interpretation is confirmed by § 30–5–301(a) which we read *in pari materia* with § 30–5–303(a). Section 30–5–301(a) states clearly that the payment must be made by the party contractually required to do so: "Payment shall be made directly to the person ... entitled thereto by the lessee or operator or by any party who assumes such payment obligation under any legal arrangement."

[¶ 96] Under the Unit NPI Contract and the Supplemental Accounting Agreement, the non-operators were responsible for providing funds and information to the operator for the purpose of applying the consolidated or basket accounting. The operator, however, was responsible for accounting to and actually paying the NPI owner. This situation is not materially distinguishable from that presented in *Moncrief.* We conclude, therefore, that the non-operator working interest owners are not responsible to the plaintiffs under the WRPA. The district court properly granted judgment as a matter of law under Rule 52(c) in favor of the non-operators on this issue.

### III. Bench Trial Rulings

#### A. *Standard of review*

[¶ 97] The following rules apply in reviewing the determinations of a district court after a bench trial:

> After a bench trial, we review the trial court's factual findings under a clearly erroneous standard and its legal conclusions *de novo.* *Hansuld v. Lariat Diesel Corp.,* 2003 WY 165, ¶ 13, 81 P.3d 215, 218 (Wyo. 2003) (citing *Rennard v. Vollmar,* 977 P.2d 1277, 1279 (Wyo.1999)). We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to the trial court's findings unless they are unsupported by the record or erroneous as a matter of law. *Deroche v. R.L. Manning Co.,* 737

P.2d 332, 336 (Wyo.1987). Although the factual findings of a trial court are not entitled to the limited review afforded a jury verdict, the findings are presumptively correct. *Piroschak v. Whelan,* 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005).

This Court may examine all of the properly admissible evidence in the record, but we do not reweigh the evidence. *Forshee, et ux. v. Delaney, et ux.,* 2005 WY 103, ¶ 6, 118 P.3d 445, 448 (Wyo.2005). Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses. We accept the prevailing party's evidence as true and give to that evidence every favorable inference which may fairly and reasonably be drawn from it. *Harber v. Jensen,* 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004) (quoting *Life Care Centers of America, Inc. v. Dexter,* 2003 WY 38, ¶ 7, 65 P.3d 385, 389 (Wyo.2003)). Findings may not be set aside because we would have reached a different result. *Harber,* ¶ 7, 97 P.3d at 60 (citing *Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Production Co.,* 2003 WY 139, ¶ 6, 78 P.3d 679, 681 (Wyo.2003)). A finding will only be set aside if, although there is evidence to support it, this Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006)

. . . .

We review questions of law de novo. *Y–O Investments, Inc. v. Emken,* 2006 WY 112, ¶ 8, 142 P.3d 1127, 1130 (Wyo.2006).

*Snelling v. Roman,* 2007 WY 49, ¶¶ 7–9, 154 P.3d 341, 345 (Wyo.2007).

**B. *Did the district court correctly determine that the non-operating defendants breached the Unit NPI Contract by failing to pay the NPI?***

[¶ 98] After the bench trial, the district court found that the non-operating defendants, Lance, SWEPI, Williams and Arrowhead, had breached their obligations under the Unit NPI Contract.

21. [The non-operators] have the obligation under Section 1 of the Net Profits Contract to pay 5% of the net profits resulting from operations under the leases. They have obligations under the Net Profits Contract (Section 2) and the Supplemental Accounting Agreement (Section 2) to provide revenue and expense information as well as contribute 5% of their gross revenue in cash so that the operators can calculate the NPI and account to and pay the NPI owners.

. . . .

23. Defendants Lance, SWEPI, Williams and Arrowhead failed to contribute net profits, failed to provide an accounting to the operator defendants in order to allow them to account for the NPI and pay net profits to the plaintiffs, and failed to pay the operators for their 5% share of gross revenue from operations under the Subject Leases.

The district court then concluded that all defendants were in breach of contract for failing to account for and pay the NPI.

[¶ 99] The non-operating defendants claim that the obligation to pay under the Unit NPI Contract belonged to the operators only and, consequently, they could not be found in breach of contract for failure to account for or pay the NPI to the plaintiffs. The pertinent part of Section 1 of the Unit NPI Contract provides:

Subject to the conditions hereinafter set forth, First Parties agree to pay to Novi a sum or sums representing 5% of the net profits (as hereinafter defined), herein referred to as "said net profits interest," resulting from operations for oil and gas by First Parties, or any of them, under those certain leases. . . .

Section 3 provides that "the responsibility for handling the accounting for net profits and making payments hereunder to Novi . . . shall be the responsibility of [the operator(s)]." The obligations and rights under the agreement carried over to First Parties' and Novi's successors.

[¶ 100] The non-operating defendants argue that the "[s]ubject to the conditions hereinafter set forth" language in Section 1 refers to the Section 3 payment provisions of the Unit NPI Contract and, therefore, places the

entire responsibility for paying the NPI on the operators. They claim that this provision relieves them from responsibility to the plaintiffs. The district court rejected the non-operators' position stating that, while the clerical responsibilities for handling the accounting and actually remitting the payments were delegated to the operators under the contract, the ultimate obligation to pay had not been delegated. The district court cited to Corbin on Contracts § 866 (1951) [§ 49.7 (2007)] in support of its decision: "The performance required by a duty can be delegated; but, by such delegation, the duty itself cannot be escaped."

[¶ 101] There is no dispute that all of the defendants, operators and non-operators alike, were successors to the First Parties. The clear language of Section 1 of the Unit NPI Contract provides that First Parties had the obligation to pay the net profits interest. If we were to adopt the non-operators' interpretation of the contract, the reference to First Parties, as opposed to operator, in Section 1 would be meaningless. In fact, under the non-operating defendants' interpretation, the First Parties who were not operators would have no material obligations under the Unit NPI Contract. Such an interpretation would violate one of the basic tenets of contract interpretation which requires that we give effect to all of the language in a contract and clearly would not implement Novi's and the First Parties' intent. Thus, we agree with the district court's interpretation of the contract—although the First Parties delegated the administrative functions to the operators, all of the defendants, including operators and non-operators, retained the ultimate obligation to pay.

[¶ 102] It was undisputed that none of the defendants paid net profits under the Unit NPI Contract, and the district court's finding to that effect was correct. As to the discrete question of whether the non-operators breached their contractual responsibility to account for and pay the net profits, there is simply no question that the district court properly held that they did. The related questions of whether the district court correctly ruled that all defendants (both operators and non-operators) were jointly and sev-

erally liable for the entire judgment will be considered below in Section III.G.

*C. Did the district court err by ruling that plaintiffs were entitled to be awarded WRPA interest and penalties against the operating defendants Shell and Ultra when the Unit NPI Contract provided that they could withhold payment of net profits, without interest, during the pendency of any dispute regarding ownership of the NPI?*

[¶ 103] As we noted in Section II. B., the WRPA applies to net profits interests. The district court ruled that, once the plaintiffs had given notice of their ownership of the NPI in February 2006, the operator defendants had an obligation to pay them under § 30–5–301(a), or to at least deposit the proceeds into escrow as allowed by the good faith provision of § 30–5–302. Because the operator defendants failed to do so, the district court ruled that they were obligated to pay interest and penalties under § 30–5–303.

[¶ 104] On appeal, Shell and Ultra, as operator defendants, argue that they were exempt from the interest and penalties provisions because § 30–5–301(a) allows parties to contract for different "arrangements" for payment. They claim that First Parties and Novi provided for just such different arrangements in Section 5 of the Unit NPI Contract, which stated: "In the event of any dispute at any time concerning the ownership of any net profits interest payable hereunder, [o]perator may withhold payment of such net profits interest or any part thereof of the amount in dispute without interest until such dispute is settled."

[¶ 105] The plain language of the Unit NPI Contract allowed the operator to withhold payment if the ownership of the net profit interest was in dispute. As we explained in Section II.B. of this opinion, once the plaintiffs gave notice of their ownership in the February 22, 2006, letter, there was no dispute over who owned the net profits interest. After that notice, the defendants continued to maintain that the NPI interest no longer existed because it was conditioned upon the continued existence of the Pinedale

Unit. The contractual provision which allowed the operator to withhold payment in the event of an ownership dispute does not apply to the defendants' attempt to renounce the contract. Novi certainly did not agree to allow the First Parties to deny the contract as a whole and still claim protection under its "no interest" provision. The contract did not, therefore, provide different arrangements for payment; once the operators were provided with sufficient evidence of plaintiffs' title, they were obligated to pay and the WRPA applied.

[¶ 106] The defendants argue that *Followwill v. Merit Energy Co.*, 371 F.Supp.2d 1305 (D.Wyo.2005) applies to their situation. There, the United States district court dismissed the plaintiffs' WRPA claim stating that the parties' contract, which was executed prior to the adoption of the WRPA, controlled the royalty calculation and the WRPA did not supersede it. *Followwill* simply does not apply here because both the Unit NPI Contract and the WRPA required payment after the defendants were properly notified of plaintiffs' interest.[16]

[¶ 107] The WRPA required the defendants to pay the plaintiffs or, at least, to deposit the NPI proceeds into escrow to avoid the statutory interest. The obligation took effect as soon as the operator defendants were made aware of the plaintiffs' interest. *Cities Service*, 838 P.2d at 157. By failing to make the required payments, the operator defendants violated the WRPA. The district court properly interpreted the Unit NPI Contract and the relevant statutes when it determined the defendants were liable for statutory interest and penalties.

### D. Was State Lease 79–0645 a "replacement lease" under the Unit NPI Contract?

[¶ 108] Wyoming State Leases 0–11505 and 0–11529 were identified in Exhibit A to the Unit NPI Contract and originally included in the Pinedale Unit. In 1977, the unit contracted and the two state leases were eliminated. The leases terminated because they were already past their primary term and there was no production attributable to the leases.[17] Two years later, in 1979, the same lands were leased to Robert E. Ribbe in State Lease 79–0645, and he assigned the lease to Questar's predecessor in 1980. Questar later assigned its interest in State Lease 79–0645 to defendants Lance and Ultra. The plaintiffs argued that Lease 79–0645 was subject to the NPI because it was a "replacement lease" under the terms of the Unit NPI Contract.

[¶ 109] The relevant provision of the Unit NPI Contract states:

7. SURRENDER—

First Parties reserve and shall have the right to release and surrender said leases except those acquired from Novi, either in whole or in part, at any time without giving any notice thereof to or obtaining any consent or approval thereof from Novi or Novi's successors in interest, and such release or surrender shall terminate the net profits interest herein provided for as to the leasehold interest which is so released and surrendered.

. . . .

In the event any lease is surrendered or released pursuant to the provisions of this section and thereafter First Parties, or any of them, obtain a lease covering lands the leasehold interest in which has been so surrendered, the interest so acquired or obtained by First Parties, or any of them, shall be subject to the provisions hereof, if such new lease is obtained within five (5) years from the date of any such surrender or release; otherwise, such new lease shall be held by First Parties, or any one of them acquiring such interest, free and clear of the provisions of this agreement

---

16. The defendants also suggest that the statute violates the prohibition in U.S. Const., Art. 1, § 10, against passing laws which impair the obligations of pre-existing contracts. Our ruling that the contract did not provide protection to the defendant operators under these circumstances effectively refutes their constitutional argument.

17. The Wyoming state leases apparently were not governed by the federal two year lease extension upon contraction of the unit.

and without any obligations whatsoever to Novi.

[¶ 110] At the conclusion of the bench trial, the district court ruled that Lease 79–0645 fell under the provisions of the last clause of Section 7 and, therefore, was subject to the NPI as a "replacement lease." The district court made the following relevant findings of fact:

11. Defendants argue that State leases 0–11505 and 0–11529 "expired" so that the wash-out provision of Section 7 of the Net Profits Contact does not apply. As of 1977, all leases in the Pinedale Unit were past their primary term, but they remained in force and effect by reason of unitization in the Pinedale Unit. The Pinedale Unit Agreement specified a lease elimination provision in Paragraph 2(e) operative upon contraction or termination of the unit by the operator.

12. On August 11, 1977, the then operator of the Pinedale Unit, El Paso Natural Gas Company ("El Paso"), wrote interest owners Mountain Fuel Supply and Hondo Oil & Gas Company announcing that it planned "activation of the automatic elimination provision of the Pinedale Unit...." On October 12, 1977, El Paso informed the United States Geological Survey as follows:

"El Paso Natural Gas hereby files a plan of development for the calendar year 1977 calling for no activity. In accordance with the foregoing, it is our view that this action will activate the automatic elimination provision of the Pinedale Unit Agreement as set forth in the amendment to said unit dated February 15, 1974."

13. The action of El Paso was in essence a surrender of all of the leases it held in the Pinedale Unit and resulted in the termination of the State leases and reversion of the mineral estate to the lessor, the State of Wyoming.

14. Lease 79–0645 was acquired by a First Party within five years of the surrender of the predecessor Exhibit A state leases and is subject to the Net Profits Contract.

(Citations omitted). The district court's conclusions of laws included:

State Lease 79–0645

82. The final clause of Section 7 of the Net Profits Contract provides protection for Novi and its successors from a "wash out." "A 'washout' is the 'elimination of an overriding royalty or other share of a working interest by the surrender of a lease by a sub lessee or assignee and subsequent reacquisition of a lease on the same land free of such interest." A "renewal clause" is included in an instrument to avoid a washout.

83. The term "surrender" involves a voluntary transfer of all or part of the defeasible fee simple estate held by the lessee back to the lessor. The surrender or release of a leasehold interest contemplates an affirmative act by the lessee.

84. El Paso surrendered Exhibit A state leases 0–11505 and 0–11529. State lease 79–0645 covers the lands in the leaseholds so surrendered, was acquired by a First Party within five years of surrender, and is burdened by the NPI under the terms of the Net Profits Contract.

(Citations omitted).

[¶ 111] As we discussed in Section I.B. of this decision, Section 7 of the Unit NPI Contract constitutes what is commonly known as an anti-washout clause. The purpose of such a clause is to protect the owner of an overriding royalty or net profit interest from having his interest removed by the lessee giving up the lease and then reacquiring the same lands without the burden. Anti-washout clauses extend the burden to a new lease obtained on the same property by the same lessee within a certain period of time. *See, e.g., Sawyer v. Guthrie,* 215 F.Supp.2d 1254, 1264 (D.Wyo.2002); *Avatar Exploration, Inc. v. Chevron, U.S.A., Inc.,* 933 F.2d 314, 319 (5th Cir.1991).

[¶ 112] Section 7 applies when the First Parties "release" or "surrender" the leases. The plain meaning of the term "surrender" is "to yield (something) to the possession or power of another." *Webster's Third New Int'l Dictionary* 2301 (2002). Similarly, the relevant definition of "release" is "to give up, relinquish, or surrender (a right, claim, etc.)." *Id.* at 1917. Both of these verbs require some sort of voluntary, affirmative

act by the one doing the surrendering or releasing.[18]

[¶ 113] The parties disagree over whether First Parties (El Paso) took an affirmative action to surrender/release the original state leases or the leases terminated automatically under the terms of the Pinedale Unit Agreement. The defendants argue that, in order for Section 7 to apply, El Paso had to voluntarily assign or transfer the leases back to the lessor (the State of Wyoming) and that did not happen here. The plaintiffs maintain the act of surrendering or releasing does not require assignment or transfer and the evidence established that El Paso took affirmative action to surrender/release the leases.

[¶ 114] The defendants direct us to a Fifth Circuit case they claim supports their position, *Fuller v. Phillips Petroleum Co.,* 872 F.2d 655 (5th Cir.1989). Fuller and Phillips both owned leases in a "Unit Area." *Id.* at 656. They entered into an operating agreement which included a provision requiring "the consent of all parties before the surrender, in whole or in part, of any lease affecting the Unit Area or, in the absence of such consent, the assignment of such leases to the non consenting parties." *Id.* at 659. Some of the leases terminated due to cessation of production and Fuller brought an action claiming breach of the provision requiring Phillips to obtain his consent before surrendering the leases. *Id.* The Fifth Circuit ruled that Phillips had not breached the contract because the leases expired on their own terms and the surrender clause was inapplicable. The court explained:

> [Fuller's argument] is belied by the legal difference between the terms "surrender" and "termination" of a lease. In the oil and gas industry, the term "surrender" refers to the contractual right of a lessee to voluntarily relinquish to the lessor all or part of the leased premises, thereby allowing the lessee to retain the most profitable portion of a lease while at the same time releasing the least profitable portion of the lease. William & Meyers, 8 *Oil and Gas*

*Law* § 966 (1985). Moreover, while a lease may be terminated by the act of one party by surrendering its rights under the lease, such a surrender may only occur while the lease is in effect. In contrast, "termination" of a lease as applied to the facts of the instant case refers to the expiration of a lease by its own terms for the failure of the operator (Phillips) to maintain operations on the leased premises. *Id.* at 659–60.

[¶ 115] *Fuller* did not involve a "washout" situation; there is no indication that Phillips reacquired the leases to Fuller's detriment. Thus, we find the case of limited value to the issue presented here. We agree, however, with the concept recited in the decision that "surrender" requires voluntary relinquishment of an interest while the lease is still in effect.

[¶ 116] The ten year primary term of the original state leases ended in 1961. The leases remained in force after that because they were included in the Pinedale Unit. The Unit Agreement had clauses for automatic contraction; nevertheless, the First Parties had negotiated with federal authorities for extension of the automatic contraction provision on at least two occasions. Amendments to the Unit Agreement reflected the extensions. Finally, on August 10, 1977, (twenty-three years after formation of the unit and sixteen years after the primary term of the leases expired), First Party and operator El Paso notified the other First Parties, with copies to state and federal authorities, that it was going to allow unit contraction. The letter stated in relevant part:

> El Paso Natural Gas Company, as Operator of [the Pinedale Unit], wishes to advise of the activation of the automatic elimination provision of the Pinedale Unit as set forth in the Amendment to said Unit dated February 15, 1974. It is anticipated that the elimination be effective September 12, 1977, the date on which the filing of a Plan of Development for the ensuing year is required. Although it is our belie[f] that

18. The parties do not make a direct argument on appeal that "surrender" is a term of art in the oil and gas industry. We note, however, that defendants' expert witness Professor Bruce Kramer testified that "surrender," in the context of oil and gas law, typically entails "a voluntary act by the lessee" that leads to the leased interest being returned to the lessor.

such action is automatic, please furnish us [with] any comments or suggestions you may have within fifteen (15) days from the date of this letter.

It is with extreme reluctance and regret that we ac[cede] to this result. . . . It appears most unlikely that elimination of certain lands from the Unit, the ultimate restoration of such lands to the public domain and the subsequent leasing thereof to others will result in said lands being developed with the same imagination and tenacity which have been heretofore demonstrated. Economic realities have brought us to the point where we feel additional immediate operations cannot be justified and therefore we feel we have no practical alternative but to ac[cede] to the above automatic elimination.

El Paso then followed up with a letter to the USGS on October 12, 1977. The letter reiterated its regret in "acceding" to the automatic elimination and also stated, in relevant part:

El Paso Natural Gas Company hereby files a plan of development for the calendar year 1977 calling for no activity. In accordance with the foregoing, it is our view that this action will activate the automatic elimination provision of the Pinedale Unit Agreement. . . .

[¶ 117] There is simply no question that El Paso affirmatively yielded possession of the leases to the lessor (State of Wyoming). Until El Paso filed its development plan of "no activity," the original state leases remained in effect as part of the Pinedale Unit. The letters make it very clear that El Paso (as operator) had the power to determine how to proceed with the unit and leases included within the unit. In fact, the First Party operators had, for twenty-three years since formation of the unit, filed development plans and negotiated amendments to the unit agreement to prevent contraction of the unit. By filing a plan of no activity, the operator acceded to the contraction of the unit. This action was a surrender that triggered the anti-washout provision. When a successor of the First Parties re-acquired the same lands in State Lease No. 79–0645 within the five year period set out in Section 7, the NPI

attached to the new lease. The anti-wash provision was designed to protect the plaintiffs (as successors to Novi) from the exact situation that happened here—surrender of the lease followed by a subsequent reacquisition of the same property by the same lessee. The district court's interpretation of Section 7 of the Unit NPI Contract was correct and its findings of fact, particularly its finding that El Paso surrendered the leases, were not clearly erroneous.

### E. Did the district court err by ruling that plaintiffs' claims were not time barred under the statute of limitations or the equitable doctrine of laches?

■■■ [¶ 118] The defendants asserted that the plaintiffs' claims were time barred by the relevant statutes of limitation and the equitable doctrine of laches. At the conclusion of the bench trial, the district court rejected the defendants' affirmative defenses. They argue that the district court's rulings were in error.

[¶ 119] The defendants are somewhat imprecise about which statute of limitation governs the plaintiffs' claims, citing in turn to Wyo. Stat. Ann. §§ 1–3–103 (LexisNexis 2009) (ten year limitation period for recovery of real property); Wyo. Stat. Ann. § 1–3–105 (LexisNexis 2009) (ten year limitation period for contract actions); and Wyo. Stat. Ann. § 1–3–109 (LexisNexis 2009) (ten year limitation for other actions). The defendants assert that the plaintiffs' claim accrued in 1985 when some of the plaintiffs brought suit against Sun seeking an accounting on a package of properties they had previously purchased from Sun, which they believed included the NPI. At first, Sun maintained that it did not have any information about the Pinedale Unit because it had never owned any interest in the unit and, consequently, had not conveyed the NPI to the plaintiffs. The defendants argue that Sun's position was based, in part, on its belief that the NPI had terminated with the Pinedale Unit. The plaintiffs provided Sun with information about its properties in the Pinedale Unit and the suit with Sun ended in settlement which included a specific transfer of the NPI.

[¶ 120] The district court rejected the factual basis for the defendants' argument that the limitations period began to run in 1985 as a result of the plaintiffs' exchanges with Sun:

> 70. Defendants argue that exchanges between plaintiffs and [Sun] in 1985 should have caused plaintiffs to institute a quiet title suit concerning ownership of the NPI. This contention is not supported in the record. Sun confirmed its receipt of ownership of the NPI by assignment from Texas Pacific Oil Company by an internal memo dated November 8, 1985, authored by Oliver Price. Exhibit B95. Sun agreed to convey whatever interest it had in the NPI by letter agreement with plaintiffs dated December 30, 1985. Exhibit B99. Sun conveyed its interest by a conveyance to Hartman et al. dated January 2, 1986. Exhibit 45/CO5. No dispute existed between Sun and plaintiffs regarding the scope and ownership of the NPI during 1985–86. Any earlier confusion regarding ownership of the NPI was resolved to plaintiffs' satisfaction when Sun conveyed to plaintiffs all interest Sun owned in the NPI.

[¶ 121] The district court's factual findings are not clearly erroneous. The record confirms the district court's finding that the controversy between plaintiffs and Sun, including the issue of whether Sun owned the NPI, was resolved to the plaintiffs' satisfaction by the exchange of information between the plaintiffs and Sun and the settlement between the parties. We, therefore, reject defendants' challenge to the district court's factual findings.

[¶ 122] At its essence, this dispute involves a claim for breach of the Unit NPI Contract. The statute of limitations on contract claims is ten years. Section 1–3–105(a)(i). In an action founded upon the breach of a written contract, the limitation period begins running when the breach occurs. It is at this time that the cause of action accrues. *Swinney v. Jones*, 2008 WY 150, ¶ 8, 199 P.3d 512, 515 (Wyo.2008); *Richardson Associates v. Lincoln–Devore, Inc.*,

806 P.2d 790, 802 (Wyo.1991). The breach was the defendants' failure, as successors to First Parties, to pay net profits to plaintiffs, as Novi's successors, in accordance with the Unit NPI Contract.[19] Net profits became due and payable in May 2005. The plaintiffs filed their suit in March 2006, less than one year after their claim accrued. The district court properly rejected the defendants' statute of limitations claim.

[¶ 123] The defendants also argue that the plaintiffs' claims are barred under the equitable doctrine of laches. "Laches is defined as such delay in enforcing one's rights that it works to the disadvantage of another." *Dorsett v. Moore*, 2003 WY 7, ¶ 9, 61 P.3d 1221, 1224 (Wyo.2003). The defense of laches is based in equity and whether it applies in a given case depends upon the circumstances. *Hammond v. Hammond*, 14 P.3d 199, 201 (Wyo.2000); *Moncrief v. Sohio Petroleum Co.*, 775 P.2d 1021, 1024–25 (Wyo.1989). There are two elements which must be shown to establish the defense of laches—inexcusable delay in the assertion of a right and injury, prejudice or disadvantage to the defendants. *Moncrief*, 775 P.2d at 1025.

[¶ 124] The district court ruled that the doctrine of laches does not apply to an action at law for breach of contract and cited *Hammond* for that statement. In *Hammond* we ruled that laches did not apply to "child support collection actions because suits for monetary judgments for child support arrearages are legal rather than equitable." *Hammond*, 14 P.3d at 202. On the other hand, as the defendants correctly point out, we have stated that claims under oil and gas contracts are subject to the defense of laches. In *Moncrief*, we stated that "innumerable cases have established that the doctrine of laches is particularly applicable to oil and gas and mining claims due to the nature of such property interests." *Moncrief*, 775 P.2d at 1025. That decision held that the plaintiffs' claims were barred under the doctrine of laches even though there was also a legal claim under the statute of limitations. *Id.* at

---

**19.** It is also notable that Sun was not a successor to the First Parties. Thus, plaintiffs could not have maintained a claim against Sun for breach of the Unit NPI Contract.

1024. *But see,* Thomas, J., concurring opinion, *Id.* at 1028 (indicating that the case should have been decided on the basis of the statute of limitations). We do not need to resolve the dilemma of whether laches may be asserted when the claim is legal in nature because the district court properly concluded that the doctrine clearly does not apply to the circumstances presented here.

[¶ 125] The defendants assert that the plaintiffs' delay in asserting their net profits interest prejudiced them because the plaintiffs did not record one conveyance document which transferred part of the NPI interest to them for twenty years or otherwise advise the defendants of their interest and they did not exercise diligence by demanding an accounting. They claim that the plaintiffs' lack of diligence led to the loss of accounting information, etc. The district court made the following finding of fact in response to the defendants' argument:

> 72. Defendants did not change their position regarding the NPI by reason of any action or non-action by plaintiffs. Defendants have not demonstrated any injury or prejudice they have suffered as a result of any alleged delay by plaintiffs. With full knowledge of the NPI, all defendants hold and continue to freely develop and financially benefit from their oil and gas operations on the Subject Leases including two valuable, original Novi leases.

[¶ 126] The district court's finding was not clearly erroneous. As we stated in our discussion of the statute of limitations, the plaintiffs' claim did not accrue until net profits were first realized in May 2005. The plaintiffs gave notice of their interest less than a year later in Mr. Hartman's February 2006 letter and they filed suit the next month.

[¶ 127] With regard to the defendants' argument that the plaintiffs' lack of diligence led to their accounting troubles, the trial evidence included discussion of numerous title opinions over many years which referred to the NPI. The Assignment Agreement, which included a non-executed copy of the Unit NPI Contract, and the Supplemental Accounting Agreement had both been recorded since 1955 and clearly set out the

First Parties' accounting responsibilities. Beginning in 1999, Questar/Wexpro wrote the operating defendants on an annual basis reminding them of their responsibilities to account for the NPI. Steve Van Hook, who had worked for McMurray during the time it owned interests in the Pinedale Field, testified that he had looked into the NPI when the field first started to be productive. He talked to representatives from Ultra and Questar, but nothing was resolved at the time. A statement made by Mr. Van Hook in a 2002 memo provides context for the defendants' treatment of the NPI. "[W]e were all too busy drilling wells and fighting with each other to address [the NPI].... All the operators kn[e]w [the NPI] exist[ed], they just d[id]n't want to face it at th[e] time." Landman Tom Noonan also confirmed that the defendants were aware of the NPI when he testified that he had investigated the NPI for Ultra beginning in 1997.

[¶ 128] Any prejudice suffered by the defendants as a result of their failure to keep accurate records was of their own making. They were clearly on notice that the NPI existed and knew they had accounting responsibilities associated with the interest. The district court's findings of fact on the laches issue are not clearly erroneous and it correctly ruled that the defendants had not established the defense.

### F. Did the district court err by refusing to exclude certain expenses from the net profits calculation?

[¶ 129] The district court made the following findings regarding calculation of the NPI due to plaintiffs:

> 27. The Net Profits Contract sets forth the terms to be applied and honored in order to perform proper computation of any payable net profits. The accounting requirements are set forth in the body of the Net Profits Contract, in Exhibit A listing the permitted royalty and overriding royalty burdens on the leases, and in Exhibit C–1, which is an Accounting Procedure.

> 28. The Net Profits Contract Accounting Procedure may not be amended with-

out the consent or approval of Novi or its successors in interest, including plaintiffs or their successors in interest. The Net Profits Accounting Procedure has never been amended.

29. The Net Profits Contract and the Net Profits Accounting Procedure establish principles to be followed in performing a proper accounting of the NPI as follows:

(a) Plaintiffs' net profits equals 4.98% of cumulative gross revenue less cumulative expenses on a consolidated basis associated with the operation of NPI leases and wells on those leases;

(b) The NPI is to be calculated each month and the incremental net profits for that month, if positive, is to be paid as soon as practicable after the end of any month in which net profits have been realized;

(c) Gross revenue is based on proceeds from wellhead gas and oil sales and on fair market value for other sales and for unsold production;

(d) Deductible expenses are all those that are reasonable and customary in connection with the operation and development of oil and gas properties. These expenses are properly chargeable against the NPI leases and are limited by amounts specified in the Accounting Procedure unless and until that procedure is amended as provided herein;

(e) Expenses that are not reasonable and customary and not properly chargeable in connection with the operation and development of NPI lease and therefore, not deductible, include, among others, federal income tax, interest on capital and other expenses, depreciation, acquisition costs, accrual accounts, and future asset retirement accounts;

(f) The Accounting Procedure limits the amount of deductible labor expense (including employee benefits), Pinedale district office expense, well overhead rates, and legal expenses; and

(g) Deductible expenditures that benefit both NPI and non-NPI wells are allocated based on the ratio of the operators' end-of-year NPI well count to total well count.

### 1. Gas used on lease

■ [¶ 130] In determining the amount of net profits due to the plaintiffs, the district court ruled that the value of gas produced but used in lease operations rather than sold was properly included on the revenue side of the calculation under the terms of the Unit NPI Contract. The defendants argue that the district court improperly interpreted the Unit NPI Contract in arriving at that decision. Section 2 of the contract pertains to computation of the net profits. That provision states in relevant part:

> In computing gross revenue, there shall be taken into account the proceeds of production sold for delivery at the wellhead. As to production not so sold, the fair market value of such production at the wellhead shall be taken into account.

■ [¶ 131] The plaintiffs argue that the "production not so sold" language of Section 2 applies to all gas produced and not sold at the wellhead, including gas used on the lease. The defendants maintain that the provision only speaks to gas not sold at the wellhead but sold downstream and does not require considering the value of gas used on the lease. We do not take contract language out of context. Instead, "[w]e interpret contracts as a whole, reading each provision in light of all the others to find the plain and ordinary meaning of the words." *State ex rel. Arnold v. Ommen,* 2009 WY 24, ¶ 40, 201 P.3d 1127, 1138 (Wyo.2009). *See also, Squillace v. Wyoming State Employees' and Officials' Group Ins. Bd. of Admin.,* 933 P.2d 488, 491 (Wyo.1997). Consistent with our rules of contract interpretation, we must interpret the disputed phrase in the context of the entire provision pertaining to calculation of the NPI.

[¶ 132] The computation provision of the Unit NPI Contract states that deductible expenses include those associated with drilling, completion and producing wells. Without question, if the producers purchased gas to use in lease operations, that expense would be deductible. In order to read the provisions of the Unit NPI Contract consistently, the revenue from gas used on the lease must either be removed from the reve-

nue calculation or deducted because it would be an allowable expense in computing net profits. We conclude, therefore, the disputed language, "production not so sold" speaks only to production that is not sold in accordance with the previous provision, i.e., at the wellhead. The language simply provides a means of calculating the value of gas sold downstream from the wellhead. It does not pertain to gas used on the lease. The district court erred by including that revenue in the net profits calculation and we remand for proceedings consistent with this decision.[20]

### 2. Fixed expenses/overhead

■ [¶ 133] The defendants claim that the district court erred by ruling that the allowable overhead expenses set out in a 1954 accounting procedure applied to their operations in the twenty-first century. As the district court recognized, the Unit NPI Contract expressly incorporated the accounting procedures contained in the standard 1953 PASO form, which was attached to the Unit NPI Contract as Exhibit C–1. The accounting procedures contained certain allowable expense amounts and included limitations on deductions for employee benefit costs, administrative overhead for drilling and producing wells and expenses associated with district and camp offices.

[¶ 134] The accounting procedure stated that employee benefit labor expenses were deductible, but that "the total of such charges shall not exceed [ten percent crossed out and 10½ percent added in] of Operator's labor costs. . . ." The accounting procedure also stated that administrative overhead for wells was a deductible expense, up to $375 per month for drilling wells and $75 per month for producing wells, although the "above specific overhead rates may be amended from time to time by agreement between operator and non-operator if, in practice they are found to be insufficient or excessive." The amounts were not standard, but were typed in by the First Parties and Novi. Section II.11 of the accounting proce-

dures limited deductible expenses for the operator's district and camp offices.

[¶ 135] The plaintiffs' expert accounting witness used the limitations included in the accounting procedures to exclude some of defendants' expenses, while defendants' expert accountant included all of their expenses as deductions in the NPI calculation. The defendants' expert stated that the overhead expenses were not restricted by the amounts in the accounting procedure because the Unit NPI Contract specifically allowed the deduction of "all expenses" and charges that are "reasonable and customary."

[¶ 136] We conclude the district court properly interpreted the overhead expense provisions of the First Parties' and Novi's agreement. While the Unit NPI Contract allows for the deduction of any reasonable and customary expenses, that provision does not govern the overhead amount. The specific provisions in the accounting procedure for overhead would not have been necessary if the parties intended that the "reasonable and customary" provision would control. The fact that they crossed out 10 percent and inserted 10½ percent for the employee benefits deduction, typed in specific overhead amounts for drilling and producing wells, and specifically designated certain district and camp office expenses as deductible, indicates that they clearly gave specific thought to those expenses.

■ [¶ 137] We do not dispute the defendants' contention that the amounts may no longer be reasonable. However, it is not our role to construe a contract to reach a different result than that clearly stated in the contract language. In other words, no matter how unwise the parties' agreement, our task is to interpret their intent as expressed in the contract's plain language. *Collins v. Finnell*, 2001 WY 74, ¶ 21, 29 P.3d 93, 101 (Wyo.2001). The parties recognized that the amounts may not continue to be feasible over time and specifically allowed for amendment of the agreement to reflect a change of conditions in Section II.12. The district court ruled

---

**20.** There is some mention in the briefs of gas "lost" before sale, but the parties provide no real analysis of the effect of "lost" gas on the NPI computation. On remand, the district court can determine whether the amount of "lost" gas is significant and address it consistent with this opinion.

that no such amendment had been made and the defendants do not direct us to any evidence showing an express amendment to the contract provisions which define allowable expenses.[21] If the proper parties agree to such an amendment in the future, different overhead amounts may be applied to future NPI calculations.

### G. Did the district court err by holding all defendants jointly and severally liable for the entire judgment?

 [¶ 138] The district court ruled that the promise to pay the NPI was a joint and several obligation of all of the defendants, as successors to First Parties. It ruled, therefore, that "each defendant is liable for the full amount of the damages resulting from [the] breach." The non-operating defendants argue that the district court erred by making them jointly and severally liable for the entire judgment.

[¶ 139] As we stated above, each defendant, as a successor to "First Parties," had a duty to pay the plaintiffs' net profit interest. That ruling does not, however, determine whether each defendant should be held jointly and severally liable for the full judgment amount. The district court cited to *Gilstrap v. June Eisele Warren Trust*, 2005 WY 21, 106 P.3d 858, 865 (Wyo.2005) and Restatement (Second) Contracts, § 289(2) (1981) in support of its decision that all defendants were jointly and severally liable for the entire judgment. In *Gilstrap*, ¶ 21, 106 P.3d at 865, we considered a warranty in a deed and recognized the general principle:

> With regard to the scope of the warranty in the context of multiple grantors, the general assumption is that the warranty obligation is joint, not several, unless specific language is included in the deed indicating that each grantor is warranting only his or her individual interest.

(Citation omitted). Section 289(2) of the Restatement (Second) of Contracts also states the general rule: "Where two or more par-

ties to a contract promise the same performance to the same promisee, they incur only a joint duty unless an intention is manifested to create several duties or joint and several duties."

[¶ 140] Although *Gilstrap* and § 289(2) stated a presumption of joint obligation, those authorities also recognize that the intention of the parties to the contract controls. The importance of the parties' intent is emphasized in Restatement (Second) Contracts § 288:

> (1) Where two or more parties to a contract make a promise or promises to the same promisee, the manifested intention of the parties determines whether they promise that the same performance or separate performances shall be given.
>
> (2) Unless a contrary intention is manifested, a promise by two or more promisors is a promise that the same performance shall be given.

[¶ 141] We turn, then, to the contract language to determine whether the defendants were jointly and severally obligated to pay the entire NPI proceeds to the plaintiffs. Section 1 imposes upon all of the defendants, as successors to First Parties, the responsibility of paying the net profits interest. However, subsequent provisions, including Section 3 (Payment) and Section 5 (Transfer), make it clear that the operator is responsible for accounting and actually remitting payments to the plaintiffs. Because the non-operators have neither the responsibility nor the authority to gather the net profit payments from each defendant and remit to the plaintiffs, the contract indicates that the non-operating defendants are only responsible for their proportionate shares of the net profits.

[¶ 142] We considered a similar situation in *Moncrief*, 816 P.2d at 107–08. As we explained above, Texaco was lessee and working interest owner on a lease burdened by Harvey's overriding royalty interest; Moncrief was the operator on the lease.

---

**21.** We reject the defendants' attempt to argue that, just by charging different well overhead amounts, the operator and non-operator defendants amended the agreement. If we were to accept that argument, the contract terms would

have no meaning whatsoever. Such a result is particularly untenable in light of the specific reference in the Unit NPI Contract to the overhead charges provided in the accounting procedure attached as Exhibit C–1.

Harvey brought suit against Texaco and Moncrief. The district court ruled that each defendant was responsible for its proportionate share of the unpaid royalties, but Harvey argued on appeal that Texaco should have been jointly and severally liable for the entire amount of unpaid royalties. We concluded that, because each defendant owned a proportionate share of the leasehold estate, "the principle of proportionate responsibility is most equitable." *Id.* at 108. Considering the language of the Unit NPI Contract and that each defendant only owns a proportionate share of the working interest(s) in the NPI leases, we conclude that the district court erred by making the non-operators jointly and severally liable for the entire NPI payment due. We reverse the district court's ruling in that regard.

### H. Did the district court properly grant credit to the defendants for plaintiffs' settlement with Questar/Wexpro?

[¶ 143] The district court entered judgment against all defendants, jointly and severally, for the NPI proceeds due from March 2006 through December 2006— $4,896,589. Prior to the trial, defendants Questar and Wexpro settled with the plaintiffs and part of the consideration for the settlement was Questar/Wexpro's agreement to release amounts they had escrowed over the years, $9,501,518.20. The district court credited the defendants 30% of the judgment, or approximately $1,468,976, to account for Questar's and Wexpro's settlement with plaintiffs. The district court explained that the 30% credit was based upon the allocation method set forth in the Supplemental Accounting Agreement executed by the First Parties. After the trial, the defendants filed a motion to alter and amend the judgment to credit the entire amount paid by Questar and Wexpro to the judgment against the remaining defendants, which would have resulted in a ruling that the defendants owed nothing to plaintiffs. The district court denied the defendant's motion to alter or amend.

[¶ 144] The defendants argue on appeal that, in light of the district court's ruling that the defendants were jointly and severally

liable for the entire amount, it violated the "one satisfaction rule" by failing to credit the defendants with the entire amount of Questar/Wexpro's settlement. The plaintiffs argue that the district court properly applied the allocation formula set out in the Supplemental Accounting Agreement. They also assert that the defendants are not entitled to a full set off of the Questar/Wexpro settlement amount because it included accrued net profits for the periods prior to and after the March through December 2006 period included in the judgment and consideration for other items including conversion of the NPI on Questar/Wexpro leases to an overriding royalty and potential WRPA penalties and interest.

[¶ 145] Given that we ruled that the district court erred by making the judgment joint and several, much of the defendants' settlement credit argument is no longer applicable. Moreover, we note that credit for settlement is "controlled by principles of equity." *Cargill, Inc. v. Mountain Cement Co.*, 891 P.2d 57, 67 (Wyo.1995). The decision to allow a set off is a matter of discretion with the district court and rests in the equitable jurisdiction of the district court. *Id.*

[¶ 146] Questar/Wexpro's settlement from the escrow account included amounts accrued before and after the period for which the district court entered judgment against the remaining defendants. In addition, the Questar/Wexpro settlement amount did not use the consolidated or "basket" accounting required by the Unit NPI Contract and upon which the judgment against the other defendants was based because Questar/Wexpro had only its individual net profit records when it calculated the net profits due and placed them in escrow. The settlement amount also included other consideration, such as conversion of the NPI to an overriding royalty and release of any potential WRPA claims (since Questar/Wexpro were operators). The judgment amount and settlement amount were not comparable. To use a colloquialism, comparing the settlement and judgment would be like comparing apples and oranges. Thus, the defendants were not entitled to a dollar for dollar credit

for the Questar/Wexpro settlement. Nevertheless, it is clear that some of the settlement amount applied to the NPI during the same period covered by the judgment. The district court properly exercised its equitable jurisdiction and discretion by applying a set off in the amount Questar/Wexpro would have been responsible for under the proportionate accounting methods included in the Supplemental Accounting Agreement.[22]

[¶ 147] Finally, the defendants argue the district court erred by adopting the plaintiffs' expert's method for determining what percentage Questar/Wexpro's settlement reflected of the NPI obligation. The plaintiffs' expert testified in the rebuttal portion of the trial that, under the Supplemental Accounting Agreement, the net profits payable by each First Party successor is determined by dividing that party's revenues by the total revenues attributable to the NPI leases. Applying those principles, the plaintiffs' expert testified that the percentage allocable to Questar/Wexpro was 30.17%. The district court adopted the plaintiffs' allocation method and granted the defendants a 30% credit against the judgment for Questar/Wexpro's settlement.

[¶ 148] The defendants claim the allocation method did not reflect the Unit NPI Contract's basic concept of allocation on the basis of net profits actually realized by the First Parties rather than comparative revenues. While we agree that the Unit NPI Contract focuses on net profits, that does not change the fact that the First Parties agreed to use the Supplemental Accounting Agreement to allocate the NPI burden among themselves and the Supplemental Accounting Agreement allocates on the basis of revenues. The district court's decision to adopt

the plaintiffs' expert's analysis was not clearly erroneous. Moreover, the court did not abuse its discretion by applying the 30% set off to the judgment for Questar/Wexpro's settlement.[23]

## IV. Attorney Fees

### A. Standard of review

[¶ 149] The resolution of whether a party is a prevailing party in determining entitlement to attorney fees is one of law, which we review *de novo*. *Veile v. Bryant*, 2005 WY 150, ¶ 7, 123 P.3d 562, 564–65 (Wyo. 2005). The final attorney fee award is, however, reviewed for abuse of discretion. *Mueller v. Zimmer*, 2007 WY 195, ¶ 11, 173 P.3d 361, 364 (Wyo.2007).

A court abuses its discretion only when it acts in a manner which exceeds the bounds of reason under the circumstances. The burden is placed upon the party who is attacking the trial court's ruling to establish an abuse of discretion, and the ultimate issue is whether the court could reasonably conclude as it did.

We have said that "[j]udicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." If the record includes sufficient evidence to support the district court's exercise of discretion, we uphold its decision.

*Id.*, quoting *Hayzlett v. Hayzlett*, 2007 WY 147, ¶ 7, 167 P.3d 639, 641–42 (Wyo.2007) (internal citations omitted).

---

22. The defendants also argue, with little analysis, that the plaintiffs' settlement with Wind River and Double Eagle, who were small non-operator working interest holders in the NPI leases, should have been credited against the judgment. The defendants do not support their argument with sufficient analysis of the relevant facts. We, therefore, decline to consider this argument. *See, William F. West Ranch, LLC v. Tyrrell*, 2009 WY 62, ¶ 21 n. 4, 206 P.3d 722, 729 n. 4 (Wyo. 2009).

23. The defendants also argue that the district court erred by failing to credit future Questar/Wexpro payments against the future NPI payments. We do not have sufficient information to make a specific determination of how future payments (under either the NPI or the Questar/Wexpro overriding royalty) will be allocated or paid, other than to affirm the district court's decision that such payments shall be made in accordance with the relevant agreements. We will not offer an advisory opinion as to any particulars with regard to such future payments. *See, e.g., Voss v. Goodman*, 2009 WY 40, ¶¶ 5–7, 203 P.3d 415, 418 (Wyo.2009) (courts cannot issue advisory opinions or adjudicate hypothetical questions).

**B. Were the non-operators the prevailing parties and, therefore, entitled to an award of attorney fees under the WRPA?**

[¶ 150] The district court ordered the operator defendants to pay plaintiffs' attorney fees, but ruled that all other parties would bear their own costs and fees. Non-operators SWEPI, Williams, Arrowhead and Lance assert that the district court erred by failing to award them attorney fees as prevailing parties pursuant to the WRPA because the district court concluded they were not liable for interest and penalties under that act.[24] The plaintiffs respond that, even though their WRPA claim against the non-operators was unsuccessful, the non-operators were not the prevailing parties in the action and, consequently, were not entitled to an attorney fee award.

[¶ 151] Wyoming follows the American Rule with regard to attorney fees. That rule states that each party is responsible for its own attorney fees unless there is an express contractual or statutory provision that allows for such an award. *Stafford v. JHL, Inc.,* 2008 WY 128, ¶ 16, 194 P.3d 315, 318 (Wyo.2008). Section 30–5–303(b) of the WRPA includes the following attorney fees provision:

> (b) The district court for the county in which a well producing oil, gas or related hydrocarbons is located has jurisdiction over all proceedings brought pursuant to this article and the prevailing party in any proceedings brought pursuant to this article shall be entitled to recover all court costs and reasonable attorney's fees.

Pursuant to this provision, the "prevailing party" in "any proceedings" brought under the WRPA is entitled to recover its costs and fees.

[¶ 152] We have defined "prevailing party" for purposes of awarding costs of litigation as one who "improves his or her position by the litigation." *Schaub v. Wilson,* 969 P.2d 552, 561 (Wyo.1998). Looking at the litigation as a whole, it is clear that the plaintiffs, rather than the non-operator defendants, were the prevailing parties. The plaintiffs secured a judgment for breach of contract against the non-operators and a declaration that the defendants' leases were burdened by the NPI. The non-operator defendants did not succeed in their bid to have the NPI interest terminated on the basis that the interest ended with the Pinedale Unit. There is simply no question that the plaintiffs improved their position by the litigation and the non-operator defendants did not.

[¶ 153] The non-operator defendants assert, however, that they were the prevailing parties under the WRPA because the plaintiffs' WRPA claims against the non-operators were unsuccessful. Section 30–5–303(b) provides that the prevailing party "in any proceedings brought pursuant to this article" is entitled to a fee award. The plain meaning of the term "proceedings" is broad, especially when phrased in the plural. *Black's Law Dictionary* 1324 (9th ed.2009) defines "proceeding" as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. Similarly, *Webster's Third New Int'l Dictionary* 1807 (2002) defines "proceeding" in the context of law as "[l]egal action; litigation." Consistent with these definitions, this Court broadly defined "proceeding" in the course of allowing attorney fees under the relevant worker's compensation statute. *Graves v. Utah Power & Light, Co.,* 713 P.2d 187, 194 (Wyo.1986) (superseded on other grounds by statute).

[¶ 154] A broad reading of the term "proceedings" is especially apt in the context of the WRPA where the right to bring an action under the act is contingent upon the existence of a pre-existing contractual obligation. In other words, the only way to bring a WRPA claim is in the course of bringing an action on the document which creates the right to the mineral royalty. *See, e.g., Ferguson,* 884 P.2d at 976 and 979. So, in this case, where the non-operator defendants were found liable under the Unit NPI Contract but not responsible for WRPA penalties and interest because they were not obligated to actually remit the payment to the plaintiffs, it is appropriate, as a matter of law, to conclude that the non-operators were not the

---

24. We affirmed that district court decision in Section II.D.

prevailing parties in the proceedings. The district court did not err by failing to grant the non-operators attorney fees. *See also, Moncrief,* 816 P.2d at 109 (ruling that district court properly held the non-operator was not responsible for the plaintiff's attorney fees under the WRPA because it was not responsible for actually making payments to the plaintiff but giving no indication that the plaintiff had to pay the non-operators' attorney fees).

[¶ 155] Furthermore, even if we were to accept the non-operators' argument that they were entitled to attorney fees because they prevailed on the WRPA claims, we would not conclude that the district court erred by denying them an attorney fees award. The district court has discretion to award suitable fees. If the non-operators were entitled to be awarded fees, it would only be for the fees attributable to their defense of the WRPA claim. Although we have not been directed to any evidence in the record regarding the amount of fees the non-operator defendants paid in defense of the WRPA claim, we are confident that the amount would represent a relatively small percentage of their total attorney fees. The WRPA issue involved a question of law that did not require factual discovery or analysis, and the appellate record on that issue represents a very small portion of an extremely voluminous record. Thus, the district court could have, as a matter of discretion, appropriately denied the non-operators' request for fees on the WRPA claim.

### C. Did the district court abuse its discretion by awarding plaintiffs over $3.9 million in attorney fees?

[¶ 156] The operator defendants, Shell and Ultra, claim the district court erred when it granted the plaintiffs' request for over $3.9 million dollars in attorney fees.[25] They claim the plaintiffs failed to properly segregate their recoverable fees from the non-recoverable fees, including those pertaining to: the non-operator defendants; the plaintiffs' "fall-back" claims including breach

of the duty of good faith and fair dealing, conversion, slander of title, punitive damages, equitable relief and rescission; the settling defendants Questar and Wexpro; and claims and motions that were resolved in favor of the defendants. The operator defendants also assert that the district court abused its discretion by allowing fees based, in part, on an unreasonable hourly rate of $400.

[¶ 157] We start with the operator defendants' argument regarding segregation of fees among claims and parties. "[S]egregation of fees between multiple clients and/or multiple claims is required when it is possible." *Cline v. Rocky Mountain, Inc.,* 998 P.2d 946, 952 (Wyo.2000). However, as we stated above, the attorney fees provision of the WRPA is broad and allows for fees to the party who improves his position as a result of the litigation in any proceedings under the act. To the extent that the operator defendants claim that the plaintiffs were only entitled to fees for the discrete WRPA claims, we reject that argument. Many of the claims that the defendants argue should have been segregated were intertwined with the WRPA claims and the breach of contract claim that had to be litigated in order to recover under the WRPA. For example, the plaintiffs' conversion, rescission, slander of title, etc., causes of action were all based upon the underlying issue of whether the NPI continued to burden the leases. Similarly, the breach of the covenant of good faith and fair dealing claim was "inextricably intertwined" with the breach of contract claim, which was the primary claim upon which the entire litigation was based. *See, Hladky,* ¶ 110, 196 P.3d at 212.

[¶ 158] The fact that plaintiffs may not have been successful on individual motions, etc., does not change the fact that they were the prevailing parties in the litigation as a whole. The defendants' argument that the attorney fees for those matters should have been segregated reveals a misunderstanding of the scope of the WRPA attorney fees provision and the definition of prevailing

---

**25.** The plaintiffs also sought more than a $1 million in costs, but the district court accepted the defendants' argument that the plaintiffs were

only entitled to $32,668.93 for costs. The plaintiffs do not contest the costs award on appeal.

party. It is also noteworthy that, while the defendants assert that the fees attributable to various claims should be segregated and not allowed in the fee award, they do not provide a comprehensive analysis of why those fees are not allowable. Although the party seeking attorney fees has the burden of proving its entitlement before the district court, the party challenging the order on appeal on the basis that the fees should have been segregated, has the burden of showing that the district court abused its discretion. *Hladky,* ¶ 110, 196 P.2d at 212–13. The defendants have failed to establish that the district court abused its discretion by refusing to require the plaintiffs to allocate fees to specific claims.

[¶ 159] With regard to the settling defendants Questar and Wexpro, the defendants are correct that the plaintiffs and settling defendants each agreed to bear their own attorney fees. Thus, the remaining defendants should not be responsible for the attorney fees plaintiffs incurred in prosecuting their claims against those specific defendants. Questar and Wexpro did not, however, settle with plaintiffs until just a couple of months before the bench trial. Prior to that, many of Questar and Wexpro's claims and defenses mirrored those of the other defendants.

[¶ 160] The plaintiffs' submission evidenced that it took steps to remove many items pertaining to Questar and Wexpro, especially when those matters did not pertain to the other defendants. For example, they eliminated, entirely, fees incurred in the settlement with Questar/Wexpro and in an associated lawsuit between Questar/Wexpro and plaintiffs. The plaintiffs also reduced the fees requested in association with the court-ordered mediation by 30% to reflect the time pertaining to Questar and Wexpro.

[¶ 161] As a practical matter, much of the plaintiffs' work pertained to all of the defendants' claim that the NPI no longer existed, making it impossible, and ultimately unnecessary, to separate the fees applicable to their claims against Questar and Wexpro and the non-operator defendants. In addition, because the Unit NPI Contract called for consolidated accounting, revenues and expenses

of all the defendants had to be figured into the net profit calculation. The district court accepted the plaintiffs' efforts to segregate the non-applicable Questar/Wexpro fees. On appeal, the defendants have not convinced us that the district court abused its discretion.

[¶ 162] Finally, we consider the defendants' argument that the fee award, as a whole, was unreasonable.

Wyoming has adopted the two-factor federal lodestar test to determine the reasonableness of attorney fee awards. This test requires a determination of whether: 1) the fee charged represents the product of reasonable hours times a reasonable rate; and 2) other factors of discretionary application should be considered to adjust the fee upward or downward.

*Hladky,* ¶ 112, 196 P.3d at 213. The factors to be considered in awarding fees are set forth in Wyo. Stat. Ann. § 1–14–126(b) (LexisNexis 2009):

(b) In civil actions for which an award of attorney's fees is authorized, the court in its discretion may award reasonable attorney's fees to the prevailing party without requiring expert testimony. In exercising its discretion the court may consider the following factors:

(i) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(ii) The likelihood that the acceptance of the particular employment precluded other employment by the lawyer;

(iii) The fee customarily charged in the locality for similar legal services;

(iv) The amount involved and the results obtained;

(v) The time limitations imposed by the client or by the circumstances;

(vi) The nature and length of the professional relationship with the client;

(vii) The experience, reputation and ability of the lawyer or lawyers performing the services; and

(viii) Whether the fee is fixed or contingent.

[¶ 163] The plaintiffs' fee request was very detailed and included the affidavits of counsel and hundreds of pages of supporting documentation. The submissions established that, although the plaintiffs' attorneys had actually charged their clients over $5 million in fees, they limited their request for an attorney fees award to just over $3.9 million. One of the defendants' primary claims that the fee request was unreasonable involves the $400 per hour fee charged by some of the plaintiffs' attorneys. They indicate that the fees exceed those charged by Wyoming attorneys, which should be capped at $300 per hour.

[¶ 164] While on its face that hourly fee may seem high, it was not charged by all of the plaintiffs' attorneys or even throughout the litigation by the attorneys who did charge that hourly fee. The defendants' argument that the highest reasonable fee for Wyoming attorneys is $250 per hour (although they would not dispute hourly rates of $300 per hour) is not borne out by the record. Michael J. Sullivan is, unquestionably, a Wyoming attorney and charged and was paid $350 per hour throughout the litigation. He also stated in his affidavit that "billing rates of $400.00 per hour for senior attorneys and $300.00 per hour for experienced oil and gas litigation attorneys are appropriate" in Wyoming. The various filings and affidavits of plaintiffs' attorneys established that this case involved unique and extremely complicated matters of oil and gas litigation and accounting. In addition, the claims involved matters of obviously significant value. We can confirm that the file in this case was massive and the issues were complex. After carefully reviewing the plaintiffs' submissions and the defendants' responses, the district court concluded:

> The Court finds that the plaintiffs' request for attorneys' fees is fair and reasonable under the circumstances of this case given the nature, extent, status of, and defendants' opposition to, these proceedings.

Having dealt with this case for a very long period of time, the district court was in the best position to analyze the attorneys' efforts and time. The defendants have not persuaded us that the district court abused its discretion in doing so.

**CONCLUSION**

[¶ 165] The district court did a masterful job of sifting through all of the materials and arguments to arrive at what was essentially a correct resolution of this case. The proceedings and record were long and complicated; indeed, the record on appeal contains many thousands of pages of filings and transcripts. Although we have found error and are reversing on a few points, we commend the district court on its handling of this case.

[¶ 166] The district court properly granted summary judgment on the plaintiffs' claim that the NPI continued to encumber the relevant leases after termination of the Pinedale Unit. To the extent that the district court's second summary judgment order stated that the plaintiffs had provided a sufficient showing of their ownership of the NPI to entitle them to payment from the defendants, we affirm. However, to the extent that it was intended to quiet title in the plaintiffs against any claims by others who are not parties to this action, we conclude that there was no justiciable controversy and reverse. The district court properly granted the defendants' Rule 52(c) motion regarding the plaintiffs' obligation to give notice under Section 5 of the Unit Net Profits Contract and correctly ruled that Mr. Hartman's February 22, 2006, letter was sufficient notice under the contract to obligate the defendants to start paying the NPI in March 2006. The district court also properly granted the defendants' Rule 52(c) motion on the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing and the non-operator defendants' Rule 52(c) motion on the plaintiffs' WRPA claims.

[¶ 167] After the bench trial, the district court correctly concluded that the non-operating defendants breached the Unit NPI Contract, although they did not violate the WRPA. Operating defendants Shell and Ultra were rightly found liable under the WRPA for interest and penalties for failing to pay or escrow the NPI payments after the plaintiffs' gave notice of their ownership of the NPI. The district court also properly

determined that State Lease 79–0645 is a "replacement lease" under the Unit NPI Contract and, therefore, burdened by the plaintiffs' NPI and the plaintiffs' claims were not time barred under either the statute of limitations or laches.

[¶ 168] We hold the district court made some errors in its damages award. Although it properly interpreted the overhead expense provisions of the First Parties' and Novi's agreement, it incorrectly concluded that produced gas used on the lease was to be included as revenue for the net profits calculation. This aspect of the judgment is reversed and remanded for recalculation of the damages. The district court also erred by making the non-operators jointly and severally liable for the entire judgment, and we reverse the district court's ruling in that regard. The district court properly granted credit to the defendants for plaintiffs' settlements with Questar/Wexpro.

[¶ 169] Finally, we conclude the district court properly determined that plaintiffs were the prevailing parties in this litigation and did not abuse it discretion in making its attorney fees award.

[¶ 170] Affirmed in part and reversed and remanded in part for proceedings consistent with this opinion.

KITE, J., delivers the opinion of the Court; VOIGT, C.J., files a dissenting opinion.

VOIGT, Chief Justice, dissenting.

[¶ 171] I respectfully dissent on what I believe to be the two main issues: whether the NPI continues to exist and, if so, whether the plaintiffs have shown that they own it.

### Continued Existence of the NPI

[¶ 172] The answer to the question of whether the unit NPI survived termination of the Pinedale Unit must be found within the Unit NPI Contract. Stated in its simplest terms, the district court's conclusion was that, although commitment of the Exhibit A leases to the Pinedale Unit was a condition precedent to the obligation to pay the unit NPI, the obligation to pay the NPI was not conditioned upon the continued existence

of the Pinedale Unit. The district court further concluded that the unit NPI was lease-based, that it was akin to a royalty interest, and that it was a covenant running with the land. In large part, the district court found the support for these conclusions in the initial Assignment Agreement, where the parties agreed to enter into "similar net profit contract[s]" for both the unitized leases and the non-unitized leases. In addition, the district court pointed out numerous instances in the Unit NPI Contract where net profits were related to operations "on the leases" as opposed to "unit operations." In coming to a different conclusion, I will discuss those provisions in more detail hereinafter.

[¶ 173] I do not disagree with the district court and the plaintiffs that we look to surrounding circumstances when interpreting even an unambiguous contract involving mineral interests. *Caballo Coal Co. v. Fid. Exploration & Prod. Co.*, 2004 WY 6, ¶ 11, 84 P.3d 311, 314–15 (Wyo.2004). Neither do I disagree that, in some circumstances, contemporaneous transaction documents may be construed along with the contract at issue, as an integrated whole. *Cliff & Co. v. Anderson*, 777 P.2d 595, 598–99 (Wyo.1989); *Busch Dev., Inc. v. City of Cheyenne*, 645 P.2d 65, 70–71 (Wyo.1982). Those rules of construction do not apply in the instant case, however, where the parties specifically provided that the Assignment Agreement was to have no effect after the leases had been assigned and the net profits contracts had been signed. In that regard, the Assignment Agreement was very much like an executory contract for sale which merges into the deed upon the latter's execution and delivery. *See Wadi Petroleum, Inc. v. Ultra Res., Inc.*, 2003 WY 41, ¶ 15, 65 P.3d 703, 710 (Wyo. 2003); *Markstein v. Countryside I, LLC*, 2003 WY 122, ¶ 31, 77 P.3d 389, 398 (Wyo. 2003). We must find the parties' intent in the two NPI contracts and in the Pinedale Unit Agreement.

[¶ 174] The Area NPI Contract, which might seem to cast the least light on this controversy, actually helps to answer the primary question of whether the Unit NPI Contract was lease-based or unit-based. In its first numbered paragraph, the Area NPI

Contract defined the term "Net Profits Interest" as follows:

> Subject to the conditions hereinafter set forth, First Parties agree to pay to Novi a sum or sums representing 5% of the net profits (as hereinafter defined), herein referred to as "said net profits interest," **resulting from operations for oil and gas by First Parties, or any of them, under those certain leases shown on Exhibit A attached hereto** and made a part hereof, such leases being herein referred to as "said leases."

(Emphasis added.) Clearly, this net profit interest is to be calculated from lease-based operations. By contrast, the term "Net Profits Interest" was defined in the Unit NPI Contract as follows:

> Subject to the conditions hereinafter set forth, First Parties agree to pay to Novi a sum or sums representing 5% of the net profits (as hereinafter defined), herein referred to as "said net profits interest," **resulting from operations for oil and gas by First Parties, or any of them, under those certain leases committed to that certain Unit Agreement for the Development and Operation of the Pinedale Unit Area and shown on Exhibit A attached hereto** and made a part hereof, such leases being herein referred to as "said leases."

(Emphasis added.) If the intent of the parties was to create a lease-based, rather than a unit-based, net profits interest in the Unit NPI Contract, there was no need for the additional language concerning leases committed to the Pinedale Unit.

[¶ 175] Similar distinctions between the two contracts can be seen by comparing the "Computation" sections. Net profits were to be computed under paragraph 2 of the Area NPI Contract as follows:

> Net profits shall be computed on the basis of **all operations applicable to said leases.**
>
> **Net profits as used herein shall mean the gross revenue** (not required for payment of the overriding royalties shown on Exhibit A and landowners' royalties) **from operations allocable to said leases after deduction of all expenses of operations.**
>
> . . . .

(Emphasis added.) By contrast, once again, net profits were to be computed under paragraph 2 of the Unit NPI Contract as follows:

> Net profits shall be computed on the basis of **all operations under the Pinedale Unit applicable to said leases. In the event that leases other than said leases are committed to the Pinedale Unit, the manner of allocating production, revenue and expenses of unit operations shall be determined as provided in the Unit Agreement and such Unit Operating Agreement as First Parties and lessees of such other leases shall enter upon.**
>
> **Net profits as used herein shall mean the gross revenue** (not required for payment of the overriding royalties shown on Exhibit A and landowners' royalties) **from unit operations allocable to said leases after deduction of all expenses of unit operations (unit operations being construed to include all operations of any of First Parties under said leases)** except those charged to the working interest owners, if any, under the said unit other than First Parties.
>
> . . . .

(Emphasis added.) The express language of the parties leaves no doubt that the unit NPI was unit-based, and not lease-based. By the very terms of the parties' agreement, the NPI cannot be determined without consideration of unit operations' revenue and unit operations' expenses. It would seem to go without saying that, without any such revenue and expenses, given the demise of the Pinedale Unit, the NPI no longer existed.

[¶ 176] The "Payment" paragraphs of the two contracts contain a similar distinction. Under the Area NPI Contract, "all accounting for the purpose of determining net profits hereunder shall be upon a consolidated basis involving **all operations under said leases.**" (Emphasis added.) Under the Unit NPI Contract, however, "all accounting for the purpose of determining net profits hereunder shall be upon a consolidated basis involving **all operations under said leases and the said Pinedale Unit.**" (Emphasis added.) Once again, the unit NPI, unlike the area NPI, is based in Pinedale Unit accounting,

and without the Pinedale Unit, there can be no such accounting.

[¶ 177] The logic of these provisions—that an NPI based upon unit operations would only exist for leases within the unit—is directly reflected within the "Surrender" paragraph of the Unit NPI Contract, wherein it is provided that the First Parties may, without Novi's consent or approval, surrender, assign or release any lease, and that such surrender, assignment, or release, "shall terminate the net profits interest herein provided for as to the leasehold interest which is so released and surrendered." In other words, the "departure" of a lease from the unit ends any unit-related operations on that lease, and therefore ends any unit-related NPI from that lease.

[¶ 178] This concept was carried through into the third major agreement among the parties—the Pinedale Unit Agreement. Novi signed the Pinedale Unit Agreement under the heading "Other Parties," presumably because Novi owned no leases or working interests that were being "committed" to the Pinedale Unit. Novi, it bears repeating, held only the NPI in most of the leases that had been committed to the unit. But the central question remains the same when looking at the Pinedale Unit Agreement as when looking at the Unit NPI Contract; that is, once the leases were committed to the Pinedale Unit, did the NPI become permanently "affixed" to those leases? In the sense that this question has been presented by the parties, the issue becomes whether the term "committed" describes an act that occurs at an instant in time, or an act that has a temporal existence until such time as it might end. The district court opted for the former concept in holding that the act of commitment of a lease to the unit was simply a condition precedent to the parties' contract obligations. The defendants argue herein that, within the industry and within these documents, the term "committed" defines the latter concept because leases can become "uncommitted" to a unit.

[¶ 179] The Unit NPI Contract provided that the NPI would be calculated for those leases listed on Exhibit A **and** committed to the Pinedale Unit. When the Pinedale Unit Agreement is read in its entirety, it becomes clear that leases committed to it were committed in the temporal sense mentioned above:

1. Lands "committed" to the agreement were described as "unitized land" or "land subject to this agreement."

2. Lands automatically eliminated after a period for failure to be included in a participating area "shall no longer be a part of the unit area and shall no longer be subject to this agreement."

3. The covenants of the agreement were to "run[ ] with the land," but only "until this agreement terminates."

4. Surrender or forfeiture of a lease resulted in that lease no longer being "committed" to the unit unless and until the new owner of the interest "re-committed" it to the unit.

[¶ 180] The intent and effect of these provisions, and others similar to them, was that the benefits and burdens of the Pinedale Unit Agreement were based upon unit operations, and unit operations existed only so long as the unit existed. Inasmuch as these same unit operations were to form the basis for accounting in regard to the Unit NPI Contract, it is only reasonable to conclude that the same parties also intended that the NPI would only exist so long as there were unit operations from which to compute it. Leases did not remain committed to the unit once removed from it through surrender or automatic termination or contraction of the unit, and certainly upon termination of the unit.[1]

[¶ 181] I agree with all of the parties and the district court that the Unit NPI Contract is unambiguous in this regard, and I agree with the defendants that its unambiguous intent was to create an NPI that was based upon operations under the Pinedale Unit, for so long as operations were conducted under

---

1. This view of the term "committed" as having a temporal existence is reflected in the Code of Federal Regulations. Under 43 C.F.R. § 3107.3–3 (2009), for example, a 20–year federal lease committed to a cooperative or unit plan continues in force and effect beyond its expiration date only for "so long as committed to the plan."

the Pinedale Unit, and for so long as a particular lease remained committed to the Pinedale Unit. The Pinedale Unit Agreement is similarly unambiguous, and shows similar intent. Unambiguous agreements do not, of course, require construction, so it is inappropriate to apply rules of construction such as the rule disfavoring construction resulting in a forfeiture, which rule was applied by the district court in its analysis. *See City of Casper v. J.M. Carey & Bros.*, 601 P.2d 1010, 1014 (Wyo.1979).

 Novi was not a party to the Supplemental Accounting Agreement entered into among the First Parties, so that agreement cannot be utilized to measure Novi's intent in entering into the Assignment Agreement or the NPI contracts. The district court, however, relying upon *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 6, 126 P.3d 909, 914–15 (Wyo.2006), looked to the Supplemental Accounting Agreement as a "surrounding circumstance" that could help to show the intent of the parties in both NPI contracts. While I agree that "surrounding circumstances" may be utilized to help determine the purpose and intent of even an unambiguous contract, they may not be utilized to create an ambiguity within the contract, or to contradict the plain meaning of contract language. *Gainsco Ins. Co. v. Amoco Prod. Co.*, 2002 WY 122, ¶ 7, 53 P.3d 1051, 1056 (Wyo.2002); *Doctors' Co. v. Ins. Corp. of Am.*, 864 P.2d 1018, 1024 (Wyo.1993).

[¶ 183] This rationale also applies to the testimony of industry experts:

Amoco's endeavor to invoke the testimony of experts with respect to industry custom and practice in applying this language inverts our rule with respect to extrinsic evidence. Instead of relying upon the extrinsic evidence to resolve an ambiguity, Amoco seeks to invoke the extrinsic evidence to structure an ambiguity. This would amount to this Court writing a new contract for the parties, and we are foreclosed from that endeavor.

*Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Prod. Co.*, 2003 WY 139, ¶ 11, 78 P.3d 679, 684 (Wyo.2003) (quoting *Amoco Prod. Co. v. EM Nominee P'ship*, 2 P.3d 534, 541 (Wyo.2000)). Partly because the summary judgment motion hearing was followed by a bench trial, the record in the instant case is replete with the testimony of oil and gas experts as to what the parties intended by their contracts. This testimony is not available, however, to change the clear intention of the Unit NPI Contract to tie net profits to Pinedale Unit operations. Summary judgment should not have been granted to the plaintiffs on the issue of the continued existence of the NPI.

***Ownership of the NPI***

[¶ 184] As noted in the majority opinion, the plaintiffs trace their ownership of the NPI through a series of mesne conveyances that must be reviewed in detail to understand the arguments of the parties. To begin with, Novi merged into Woodson Oil Company (Woodson) on January 20, 1958. Subsequently, Woodson defaulted on a loan owed to The Prudential Insurance Company of America (Prudential), and on November 8, 1961, Woodson conveyed to Prudential certain properties, in lieu of foreclosure. Included within the conveyed properties were the following:

(i) All of the oil and gas leases, oil, gas and mineral leases, leasehold estates, mineral interests, royalty interests, overriding royalty interests, production payments, net profit interests, and other interests in oil, gas and other minerals affecting lands located in the State of Colorado, Louisiana, Oklahoma and Wyoming that are described in Exhibits A and Exhibits B attached hereto and made a part hereof for all purposes, all of which are covered by and subject to the Deed of Trust;

(ii) All other oil and gas leases, oil, gas and mineral leases, leasehold estates, mineral interests, royalty interests overriding royalty interests, production payments, net profit interests, and other interests in oil, gas and other minerals now owned by Woodson which are located in the State of Colorado, Louisiana, Oklahoma and Wyoming;

. . . .

(iv) All of the interest of Woodson under all contracts, operating agreements, unit agreements, gas contracts, rights of way,

easements, surface leases, and permits and licenses affecting any of the properties and interests in properties described in Exhibits A and Exhibits B attached hereto, including but not limited to all contracts and other instruments described or referred to in Exhibits A and Exhibits B attached thereto.

. . . .

EXHIBIT "A"

SUBLETTE COUNTY, WYOMING
OIL AND GAS LEASES—
PRODUCING

I. LEASEHOLD INTERESTS

A 5% net profits interest in the Pinedale Unit, created by the Pinedale Unit Agreement dated April 1, 1954, by and between El Paso Natural Gas Company, as Operator, and Continental Oil Company et al, as Non–Operators, which net profits interest is created by a certain Net Profits Contract dated April 1, 1954, by and between Malco Refineries, Inc., El Paso Natural Gas Company, Continental Oil Company, and Novi Oil Company, both the Pinedale Unit Agreement and the Net Profits Contract being filed in the Office of the Bureau of Land Management, Cheyenne, Wyoming; reference being hereby made to the Pinedale Unit Agreement, and to the record thereof in the Bureau of Land Management, Cheyenne, Wyoming, for all purposes, including a description of the leases subject thereto and the lands covered thereby, and reference being hereby made to said Net Profits Contract and to the record thereof in the Bureau of Land Management, Cheyenne, Wyoming, for all purposes.

. . . . .

[¶ 185] Under the heading "Exhibit "B" Sublette County, Wyoming Oil and Gas Leases—Non–Producing," Exhibit B contained the description of that portion of the Lozier fee lease shown in Exhibit A to the Area NPI Contract, but not the description of Lease No. 019548 that also appears in that Exhibit A. Clearly, the conveyance from Woodson to Prudential intended to transfer Woodson's interest in the NPI connected to the Pinedale

Unit and the leases committed to it in the original Exhibit A, plus Woodson's interest in the area NPI as it related to the non-unit portion of the Lozier lease shown in the original Exhibit A. The intent of the Woodson–Prudential transfer in regard to the non-unit portion of Lease No. 019548 is not so clear, other than the fact that it was not included in any particularized description of what was being transferred.

[¶ 186] Immediately upon receiving the above-described properties from Woodson, Prudential transferred the same to Texas Pacific Coal and Oil Company (TP Coal), reserving unto itself a $2,000,000 production payment, which has since been satisfied, plus a 50% Net Profit Overriding Royalty Interest defined as "50% of the net profits, if any, as hereinafter defined, that are realized by Texas Pacific from the ownership, maintenance, and operation of the Woodson Properties. . . ." The lease descriptions attached to this conveyance as Exhibits "A" and "B" are identical in relevant part to those attached as exhibits to the Woodson–Prudential conveyance. Were it not for the reservation, it would be clear that Prudential transferred to TP Coal everything it received from Woodson. The question becomes what it was, as pertinent to the Pinedale NPI, that Prudential intended to reserve. It did not simply reserve 50% of the NPI. Instead, it reserved 50% of net profits realized from operation of all the Woodson properties. The problem is that the NPI is calculated from the operations of the Pinedale Unit on the committed leases, whereas the 50% is calculated from the net profits realized from operation of all the Woodson properties. An example may show the difficulty: what happens if the Pinedale Unit leases showed a profit for a particular period, while the Woodson properties as a whole showed a loss? It must be remembered that Prudential conveyed away the NPI, keeping only a 50% interest in the net profits of the Woodson properties. Would TP Coal, in that situation, be entitled to the 5% NPI from the Pinedale Unit leases' profit, while Prudential would be entitled to nothing, because the Woodson properties, as a whole, did not have a net profit?

[¶ 187] On September 13, 1984, Prudential "assigned and conveyed" to Doyle Hartman, one of the plaintiffs herein, the 50% Net Profit Overriding Royalty Interest that it had reserved in its conveyance to TP Coal. The Hartman plaintiffs identify this transaction as the source of half of their ownership of the NPI. Prudential, however, did not own half of the NPI. TP Coal owned the NPI. Prudential reserved, and therefore owned, only the 50% interest in any net profits from all the Woodson properties. I fail to see how the conveyance in 1984 transferred any part of the "ownership" of the NPI to Hartman.

[¶ 188] Meanwhile, on November 1, 1963, TP Coal conveyed to Joseph E. Seagram & Sons, Inc. (Seagram) all of the "mineral, royalty, overriding royalty, production payment, fee and other interests, rights and properties" listed in an attached exhibit, which listed properties included the Lozier fee lease NPI and the NPI for Wyoming state leases 015315, 015314, and 019548. The three numbered Wyoming state leases are three of the four Novi leases listed in the Unit NPI Contract, while the legal description for the Lozier fee lease combines the separate legal descriptions from the Unit NPI Contract and the Area NPI Contract. The conveyance from TP Coal to Seagram also transferred the following:

> C. Without limiting the foregoing all of Grantor's right, title and interest (whether now owned or hereafter acquired by operation of law or otherwise) in, to and under all mineral, royalty, overriding royalty, production payment, fee and other interests, rights and properties of every kind and character insofar as the same cover or relate to lands located in any County, Parish or State referred to in Exhibit "A", even though such mineral, royalty, overriding royalty, production payment, fee and other interests, rights and properties be incorrectly described or referred to, or a description thereof be omitted in this Conveyance....

Notably absent from this conveyance is any specific indication of an intent to transfer TP Coal's interest in the balance of the Pinedale Unit leases and the NPI related thereto.

[¶ 189] On June 19, 1970, Seagram conveyed to Texas Pacific Oil Company, Inc. (TP Oil) its interests in the four Sublette County leases, specifically referencing the original Unit NPI Contract, and the Prudential–TP Coal conveyance.[2] On its face, the intent of this transaction was to convey to TP Oil the interests Seagram received from TP Coal. Ten years later, however, on August 29, 1980, Seagram made a second conveyance to TP Oil, this time conveying, *inter alia,*

> all of Grantor's right, title, interest and estate of every nature and description, if any, in and to any additional oil, gas and/or mineral leases; and any other mineral interests held as of the Effective Date which were acquired by Grantor from Texas Pacific Coal and Oil Company ... or otherwise acquired in connection with Grantor's oil and gas operations ... covering lands located within the United States of America....

Apparently, there was a perceived need in 1980 to clear up the Seagram to TP Oil conveyance with a "catch-all" transfer. A "catch-all" or "cover-all" clause, sometimes called a "Mother Hubbard" clause, is, however, meant to extend the land description in an instrument to cover small contiguous parcels that may inadvertently have been omitted from a description. Courts have been reluctant to apply such clauses to incorporate into a transaction a quantum of land of considerable size in relation to that actually described. *See* 2 Kuntz, *The Law of Oil and Gas* § 22.3 (Lexis 1989); 1 Williams & Meyers, *Oil and Gas Law* § 221.3 (Lexis 2009).

[¶ 190] On August 29, 1980, TP Oil conveyed the following to Sun Oil Company (Delaware) (Sun):

> . . . .
>
> U. The oil, gas and other mineral interests, rights and properties which are specifically described in Schedule B attached hereto and made a part hereof for all purposes....
>
> . . . .

---

**2.** The description of the Lozier fee lease in this conveyance again combines the legal descriptions of the Lozier lease listed in the exhibit attached to the Unit NPI Contract and the Lozier lease listed in the exhibit attached to the Area NPI Contract.

Z. Without limitation of the foregoing, all of TP's right, title, interest and estate of every nature and description, if any, in and to any additional oil, gas and/or mineral leases covering, and any other oil, gas and/or mineral interests (including surface estates from which such interests have not been severed) in, any land within the United States of America. . . .

Schedule B specifically listed Lease 80034–0001, recorded at W–60564, named "TPOC," dated October 1, 1977, and covering certain lands in Sublette County, Wyoming. A little over a year later, TP Oil and Sun entered into a Supplemental Conveyance and Agreement, made effective as of the date of the earlier conveyance, in which the intended conveyance was more specifically identified, including the NPI related to the three federal leases from the Unit NPI Contract, and the combined Lozier legal description from both NPI contracts. As with the earlier TP Coal–Seagram and Seagram–TP Oil transactions, there is no specific showing of an intent to convey any interest in the balance of the leases originally committed to the Pinedale Unit.

[¶ 191] On January 2, 1986, Sun and the Hartman group entered into a Conveyance and Agreement whereby the former conveyed to the latter Sun's interests in the properties it obtained from TP Oil on August 29, 1980, including its interests in properties in Sublette County, Wyoming, specifically referencing the Pinedale Unit properties and the Lozier lease. It is the plaintiffs' position that this transaction completed its ownership of the NPI, half coming directly from Prudential, and half coming through the Woodson–Prudential–TP Coal–Seagram–TP Oil–Sun–Hartman route. The defendants contend, on the other hand, that neither series of transactions accomplished a conveyance of the Unit NPI.

[¶ 192] The district court concluded that these conveyances unambiguously left the plaintiffs owning the NPI. In reaching that conclusion, the district court applied the following law:

Concerning the construction and interpretation of the conveyances referenced above, there are a number of applicable legal principles. The ultimate goal of interpretation of a deed is to discern the intent of the parties. *Mullinnix, LLC v. HKB Royalty Trust,* [2006 WY 14, ¶ 22,] 126 P.3d 909[, 919] (Wyo.2006) and the nature and extent of a particular conveyance is determined by the intent of the parties. *Kennedy Oil v. Lance Oil & Gas Company, Inc.,* [2006 WY 9, ¶ 29,] 126 P.3d 875[, 884] (Wyo.2006). Therefore, to construe a deed, a Court must consider the intent of the parties from the plain, unambiguous language utilized. *Bixler v. ORO[Oro] Management LLC,* [2004 WY 29, ¶ 18,] 86 P.3d 843[, 849] (Wyo.2004). The focus must be on the entire document including the title, all parts of the deed and its terms, and any habendum. *Smith v. Nugget Exploration, Inc.,* 857 P.2d [320,] 323[–24] (Wyo.1993). If the intent of the parties can be gathered in this manner, it should be done so as a matter of law. *Glover v. Giraldo,* 824 P.2d 552[, 554] (Wyo.1992). In the absence of controlling factors to the contrary, doubtful language in a conveyance is to be treated as transferring the larger, less restricted estate rather than the smaller, more restricted estate. *City of Casper v. J.M. Carey & Brother,* 601 P.2d 1010[, 1014] (Wyo.1979). W.S. § 34–2–101 provides that every conveyance of real estate shall pass all of the estate, unless the intent to pass a lesser estate shall appear or necessarily be implied. If the intent of the parties does not readily appear, the language used is to be read in light of the surrounding circumstances and when extrinsic evidence is considered, a question of fact exist[s]. *Gregory v. Sa[ ]nders,* 635 P.2d 795[, 800] (Wyo. 1981), *Knadler v. Adams,* 661 P.2d 1052[, 1053] (Wyo.1983).

[¶ 193] Large portions of the defendants' numerous briefs are taken up with the contention that the plaintiffs were not entitled to summary judgment **as a matter of law** because the law was incorrectly applied by the district court. They argue, for instance, that the precepts of *City of Casper* and Wyo. Stat. Ann. § 34–2–101 (LexisNexis 2009) do not apply in this instance because the NPI, as created by the relevant instruments, is a

personal property right, rather than an estate in land. *See Ferguson v. Coronado Oil Co.,* 884 P.2d 971, 975–77 (Wyo.1994). Further, they note that the resolution of "doubtful language" via application of the larger estate/smaller estate analysis of *City of Casper,* being a rule of contract construction, may only be applied to **ambiguous** contracts, and if the contract is ambiguous, summary judgment is not available. *See Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC,* 2008 WY 69, ¶ 5, 185 P.3d 1259, 1261 (Wyo.2008); *Wolter v. Equitable Res. Energy Co.,* 979 P.2d 948, 951 (Wyo. 1999); *Smith v. Nugget Exploration, Inc.,* 857 P.2d 320, 324 (Wyo.1993); *McNeiley v. Ayres Jewelry Co.,* 855 P.2d 1242, 1244 (Wyo. 1993); *Stewman Ranch, Inc. v. Double M. Ranch, Ltd.,* 192 S.W.3d 808, 811 (Tex.App. 2006); and *Painter v. Alexandria Water Co.,* 202 Va. 431, 117 S.E.2d 674, 678 (1961).

[¶ 194] Once again, this is how we review a summary judgment:

> The propriety of a summary judgment is evaluated "by employing the same standards and by examining the same material as the district court. We examine *de novo* the record, in the light most favorable to the party opposing the motion, affording to that party the benefit of all favorable inferences that may be drawn from the record. If upon review of the record, doubt exists about the presence of issues of material fact, that doubt must be resolved against the party seeking summary judgment. We accord no deference to the district court's decisions on issues of law."

*Jacobson v. Cobbs,* 2007 WY 99, ¶ 7, 160 P.3d 654, 656 (Wyo.2007) (citations omitted) (quoting *Linton v. E.C. Cates Agency, Inc.,* 2005 WY 63, ¶ 7, 113 P.3d 26, 28 (Wyo.2005)). What that means in practical effect is that we must first review the conveyances to determine whether their relevant provisions are unambiguous. If we find that not to be the case, the summary judgment must be reversed and the matter remanded for trial on the ownership issue. If the conveyances are, however, unambiguous, we must then determine if their combined effect is the plaintiffs' ownership of the NPI. This requires a separate analysis of the particular language of each instrument of conveyance.

[¶ 195] No one disputes that Novi was the original grantee of the NPI under the Assignment Agreement, the Unit NPI Contract, the Area NPI Contract, and the Pinedale Unit Agreement. Likewise, no one disputes that Novi merged with Woodson, with Novi's rights and interests becoming vested in Woodson. On November 8, 1961, Woodson conveyed to Prudential, in lieu of foreclosure, numerous oil and gas interests in numerous states. Specifically included in that transfer was the NPI created by the Unit NPI Contract. In the attachments to the conveyance, the unit NPI is listed in Exhibit A under the heading "Oil and Gas Leases—Producing," and the extra-unit Lozier fee lease is listed under "Leasehold Interests" in Exhibit B under the heading "Oil and Gas Leases—Non–Producing," but noting that the interest is subject to the NPI. Combined with the conveyance language set forth earlier herein, this language unambiguously sets over from Woodson to Prudential all of Woodson's interests in the NPI.

[¶ 196] On November 8, 1961, Prudential conveyed the Woodson properties to TP Coal, reserving unto itself a "Net Profit Overriding Royalty Interest," described as "an undivided 50% of all of the oil, gas, other hydrocarbons and other minerals that may be produced, saved and sold from the Woodson Interests...." The granting clause not only specifically mentioned net profit interests, and specifically identified the interests described in the exhibits, but also contained the following "catch-all" language:

> ..., together with all other interests of any such character, wheresoever located, which have been acquired by Prudential from Woodson Oil Company....

Attached to the conveyance as Exhibits A and B were the identical Exhibits A and B that had been attached to the Woodson–Prudential conveyance. The relevant effect of this transaction, as reflected in the unambiguous wording of the instrument, was that TP Coal became the owner of the NPI. Prudential did not reserve a 50% interest in the NPI; rather, it reserved a 50% interest in the net profits of the Woodson properties.

[¶ 197] In the other series of conveyances, the plaintiffs obtained "ownership" of the NPI only in relation to the four listed leases. The leases, themselves, were not assigned to the plaintiffs, because Novi had already assigned them to the First Parties under the original agreements. The various catch-all clauses cannot be seen as having morphed these transactions from conveyances of interests covering the specified 5,748.41 acres into conveyances of interests covering over 90,000 acres.[3] The district court erred in finding no holes in the plaintiffs' chain of title. Neither Prudential nor Sun held 50% of the unit NPI. Prudential reserved, and conveyed to Hartman, a 50% interest in the net production from all the Woodson properties. Sun obtained from TP Oil, and conveyed to Hartman, the unit NPI as it pertained to the four leases, less whatever interest in the NPI may be said to have been reserved by Prudential as part of the Woodson net profits interest. The balance of the NPI "ownership" apparently remained with TP Coal.[4]

[¶ 198] I would conclude from all of this that the state of the record is not such that the plaintiffs have given the defendants sufficient notice of their ownership of the NPI, if it exists at all, to require the plaintiffs to pay them millions of dollars to satisfy the NPI. Summary judgment should not have been granted to the plaintiffs on the ownership issue.

---

3. The area in the TP Coal–Seagram and Seagram–TP Oil transactions totaled 6,321.77 acres because it included the non-unit portion of the Lozier fee lease. The acreage within the unit covered by these leases was actually only 5,748.41, as was recognized in an internal TP Coal memorandum.

4. TP Coal is not a party to this proceeding, and I am not saying that we are determining ownership of the unit NPI, other than to say that these plaintiffs did not prove such ownership.